JUDGE BERMAN

ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

UNITED STATES OF AMERICA    :       17 CRM 019

v.    :   15 U.S.C. § 1
(Conspiracy to Restrain Trade)

RICHARD USHER,    :
ROHAN RAMCHANDANI, and
CHRISTOPHER ASHTON,    :

Defendants.    :

------------------------------------------------------------ x

THE GRAND JURY CHARGES THAT, AT ALL TIMES RELEVANT TO THIS INDICTMENT:

### 15 U.S.C § 1
### (Conspiracy to Restrain Trade)

### General Allegations

1.      The foreign currency exchange spot market ("FX Spot Market") is a global market in which participants buy and sell currencies for immediate delivery (or "on the spot"). Between $1.5 and $2 trillion in currencies were traded each day during the period between 2010 and 2012.

2.      In the FX Spot Market, currencies are traded against one another in pairs. For each pair, currency exchange rates are expressed as units of one currency, known as the counter currency, that would be required to purchase one unit of the other currency, known as the base currency. An exchange rate is thus a price – that is, the price in one currency that a party will be paying to another party to buy another currency. The Euro/U.S. Dollar ("EUR/USD") currency pair is the most traded currency pair by volume, with a worldwide trading volume that averaged between $400 and $500 billion per day during the period between 2010 and 2012.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: JAN 1 0 2017

3. Unlike in many stock markets, there is no single, official exchange in the FX Spot Market that facilitates the trading of one currency for another. Instead, the FX Spot Market is an over-the-counter market, meaning that customers trade directly with dealers. Dealers are financial institutions that stand ready to fill orders to buy or sell the major world currencies upon the request of market participants, which include other dealers, corporations, money managers, insurance companies, governments, central banks, pension funds, hedge funds, and investment companies.

4. When quoting a price to a potential customer, a dealer may provide its price to buy the currency (its bid), its price to sell the currency (its offer or ask), or both. When filling a customer order, a dealer either buys the currency that the customer wants to sell, or sells the currency that the customer wants to buy – thus, the dealer serves not as a broker, but as the counterparty to the transaction.

5. Dealers employ traders to perform functions relevant to a dealer's role in the FX Spot Market including, but not limited to, monitoring market information, quoting prices to potential customers, buying and selling currencies to fill orders, and engaging in proprietary trading, that is, trading on the bank's own account as a form of currency speculation. At many dealers, including those relevant here, traders were assigned one or more currency pairs and were responsible for making profits and avoiding losses in those books of business. In general, a trader seeks to book profit on his trades, including customer orders, by selling a currency at a price that is higher than the price at which the trader acquired that currency, or by buying a currency at a price that is lower than the price at which the dealer sold that currency, and booking the difference in his currency portfolio.

6.  An important part of a trader's responsibility is risk management. EUR/USD exchange rates can fluctuate rapidly, often from second to second. A trader who has purchased a currency and continues to hold it (long) or has sold a currency that he does not own (short) is at risk that the price will quickly move in an unfavorable direction, causing him a loss in his currency portfolio. Traders must therefore strategically manage their risk positions in a particular currency by buying or selling when price is favorable, or by holding risk in anticipation of a favorable movement in price, with the ultimate goal of making profit and avoiding loss.

7.  Traders find liquidity – that is, a source of currency that is ready to be bought or sold – through the interdealer market, also known as the interbank market. The interdealer market is a virtual marketplace in which dealers post prices and trade currencies, most often through electronic platforms hosted by third parties, and also through interdealer brokers.

8.  For EUR/USD, Electronic Broking Services ("EBS") was the electronic platform most widely used by traders during the relevant period. EBS is an electronic exchange on which traders anonymously post prices and volumes at which they are willing to buy or sell. On the EBS interface, prices are arrayed according to the highest price any trader has posted to buy (bid) and the lowest price that any trader has posted to sell (offer). Prices are set through the interplay of traders' competing bids, offers, and completed trades. The highest bid price will move lower if trading exhausts the volume of currency available at that price; the lowest offer price will move higher if trading exhausts the volume of currency available at that price. In addition, the highest bid price will move higher (or the lowest offer price will move lower) if better prices are quoted by other traders. Thus, in essence, EUR/USD prices on EBS are set through a continuous auction, with traders from various dealers making offers and bids, and accepting offers and bids,

in competition with one another, and generally establishing the best available exchange rate for a given currency pair in the FX Spot Market. In this continuous auction, individual actions taken by competing traders – to bid or not bid, to offer or not offer, to trade or not to trade, at certain times, and using certain tactics – can cause or contribute to a change in the exchange rate shown in the EBS interface, and thus may benefit, harm, or be neutral to a competing trader.

9.  A currency fix serves as a momentary benchmark of the exchange rate for a given currency pair. A fix refers to a point in time at which the exchange rate between two currencies (the fix price or fix rate) is calculated and later published. Fix prices can be used in many ways, including as a point of reference for market participants who are monitoring the price of EUR/USD, or as an agreed-upon price for a currency trade that will take place at a future time.

10. During the period relevant to this Indictment, the two predominant fixes for EUR/USD were the European Central Bank fix occurring each trading day at 2:15 PM (CET) ("ECB Fix") and the World Markets/Reuters fix occurring each trading day at 4:00 PM (GMT) ("WMR Fix"). Although the EUR/USD fix rates for the ECB Fix and WMR Fix were calculated differently, both were based on real-time bidding, offering, and trading activity by traders competing on EBS.

11. Dealers often take orders from customers to buy or sell a currency at a price to be set at an upcoming fix ("fix orders"). The dealers' traders must manage the risk associated with fix orders, as with any other type of order, to make profit and avoid loss. However, unlike with respect to other types of orders, traders have advance knowledge of what their risk positions will be at a given fix, because traders are typically informed of the net amount of orders they will have to buy or sell a currency at the upcoming fix. As a result, traders are typically aware of whether it is financially advantageous to them for the fix price to be higher than the current price

4

(if the trader will be a net seller at the fix) or for the fix price to be lower than the current price (if the trader will be a net buyer at the fix). Traders may then bid/offer and trade in the interdealer market prior to the time of the fix in order to manage their risk, including by bidding/offering or trading in a manner contributing to the price moving higher or lower, and by positioning themselves to profit from an anticipated price movement by the fix time.

12.     A substantial number of EUR/USD transactions are settled through a third-party settlement bank that is headquartered in New York, New York ("Settlement Bank"). The Settlement Bank maintains a matching and settlement system for member banks engaged in foreign exchange transactions. The USD portion of all foreign exchange transactions settled by the Settlement Bank flows in and out of its USD account at the Federal Reserve Bank of New York.

### The Defendants

13.     From in or about 2004 through in or about 2010, defendant RICHARD USHER was employed as a EUR/USD trader by a dealer in the FX Spot Market that was an affiliate of The Royal Bank of Scotland plc. Beginning in or about 2009, in addition to his role as EUR/USD trader, USHER managed his employer's UK desk for the spot trading of eleven major currencies, with responsibility for supervising other FX spot traders. From in or about July 2010 through in or about October 2013, USHER was employed by a dealer in the FX Spot Market that was an affiliate of JPMorgan Chase & Co. Beginning in or about December 2011, in addition to his role as EUR/USD trader, USHER was head of his employer's desk for FX spot trading in Emerging Markets in Europe and Asia, with responsibility for supervising approximately eight FX spot traders. In addition, beginning in or about May 2012, USHER was named a Managing Director.

14. From in or about 2001 through in or about January 2014, defendant ROHAN RAMCHANDANI was employed by a dealer in the FX Spot Market that was an affiliate of Citicorp, and became a EUR/USD trader in or about 2004. Beginning in or about March 2010, in addition to his role as EUR/USD trader, RAMCHANDANI was named Managing Director and head of his employer's spot trading of ten major currencies, with responsibility for supervising other FX spot traders.

15. From in our about September 2006 through in or about May 2015 (suspended as of November 2013), defendant CHRISTOPHER ASHTON was employed by a dealer in the FX Spot Market that was an affiliate of Barclays PLC, and became a EUR/USD trader in or about 2011. Beginning in or about May 2011, ASHTON became his employer's Co-Head of Spot FX in London, and shortly thereafter Head of Spot FX in London, with responsibility for supervising other FX spot traders.

16. Each of the banks that employed USHER, RAMCHANDANI, and ASHTON, as described in Paragraphs 13-15 above, as well as certain co-conspirators, was a member of the Settlement Bank at all times relevant to this Indictment. For those banks, the USD portion of EUR/USD transactions flowed in and out of U.S. Dollar foreign exchange accounts located in New York and Connecticut, regardless of whether those transactions were settled through the Settlement Bank.

17. Various corporations and individuals, not made defendants in this Indictment, participated as co-conspirators in the offense charged and performed acts and made statements in furtherance of it.

## Description of the Offense

18.   From at least as early as December 2007 and continuing at least through January 2013 (the "relevant period"), the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, RICHARD USHER, ROHAN RAMCHANDANI, and CHRISTOPHER ASHTON (collectively, "Defendants"), and their co-conspirators, participated in a combination and conspiracy to suppress and eliminate competition for the purchase and sale of EUR/USD in the United States and elsewhere by fixing, stabilizing, maintaining, increasing, and decreasing the price of, and rigging bids and offers for, EUR/USD in the FX Spot Market. The combination and conspiracy engaged in by Defendants and their co-conspirators unreasonably restrained interstate and U.S. import trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

19.   RICHARD USHER knowingly joined and participated in the conspiracy from in or about December 2007.

20.   ROHAN RAMCHANDANI knowingly joined and participated in the conspiracy from in or about December 2007.

21.   CHRISTOPHER ASHTON knowingly joined and participated in the conspiracy from in or about December 2011.

22.   The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among Defendants and their co-conspirators, the substantial terms of which were to suppress and eliminate competition for the purchase and sale of EUR/USD in the United States and elsewhere by fixing, stabilizing, maintaining, increasing, and decreasing the price of, and rigging bids and offers for, EUR/USD in the FX Spot Market.

## **Means and Methods of the Conspiracy**

23. For the purpose of forming and carrying out the charged combination and conspiracy, USHER, RAMCHANDANI and ASHTON, the Defendants, together with their co-conspirators, did those things that they combined and conspired to do, including, among other things:

(a) participating in telephone calls and electronic messages, including engaging in near-daily conversations in a private electronic chat room, which the chat room participants, as well as others in the FX Spot Market, at times referred to as "The Cartel" or "The Mafia," and discussing, among other things, past, current, and future customer orders and trades; customer names; and risk positions;

(b) agreeing to suppress and eliminate competition in the FX Spot Market, including, at times, by refraining from trading against each other's interests and coordinating their bidding, offering, and trading as described in Paragraphs 23(c) and (d) below;

(c) coordinating their bidding, offering, and trading in certain instances, for the purpose of increasing, decreasing, maintaining, and stabilizing the price of EUR/USD, including by refraining from bidding, offering, and trading at certain times;

(d) coordinating their bidding, offering, and trading, including by refraining from bidding, offering, and trading, in and around the time of certain ECB and WMR fixes, for the purpose of increasing, decreasing, maintaining, and stabilizing the price of EUR/USD by the time of the fix, profiting from trading in and around the time of the fix, and avoiding or lessening any loss from trading in and around the time of the fix;

(e) filling customer orders at prices determined by such fix rates; and

(f) monitoring and enforcing the combination and conspiracy set forth in Paragraph 18.

## Trade and Commerce

24.  During the relevant period covered by this Indictment, Defendants and their co-conspirators purchased, sold, and caused the transfer of Euros and U.S. Dollars in the United Kingdom, Switzerland, the United States, and elsewhere. The charged combination and conspiracy involved trade or commerce within the United States and U.S. import trade or commerce in EUR/USD transactions.

25.  During the relevant period covered by this Indictment, the charged combination and conspiracy purchased, sold, and caused the transfer of substantial quantities of Euros and U.S. Dollars in a continuous and uninterrupted flow of interstate and U.S. import trade and commerce to counterparties located in various states in the United States from other states and foreign countries.

26.  During the relevant period covered by this Indictment, a substantial number of EUR/USD transactions conducted by defendants and their co-conspirators were settled through the Settlement Bank in the United States.

27.  The activities of the charged combination and conspiracy were within the flow of, and substantially affected, interstate and U.S. import trade and commerce. For example, during the relevant period covered by this Indictment, the USD portion of affected EUR/USD transactions:

(a)  flowed in and out of USD accounts located in New York and Connecticut in interstate and U.S. import trade and commerce;

(b)  moved in interstate commerce to and from counterparties located in various U.S. states other than the U.S. states in which the USD accounts were located; and

9

(c)     flowed in and out of the Settlement Bank's USD account at the Federal Reserve Bank of New York in interstate and U.S. import trade and commerce.

28.     The charged combination and conspiracy had a direct, substantial, and reasonably foreseeable effect on interstate and U.S. import trade or commerce in EUR/USD transactions, and that effect, in part, gives rise to this charge. The charged combination and conspiracy had a substantial and intended effect in the United States on EUR/USD transactions. For example, the charged combination and conspiracy purchased, sold, and caused the transfer of substantial quantities of Euros and U.S. Dollars to and from counterparties in the United States in interstate and U.S. import trade and commerce, including purchases, sales, and transfers at the ECB and WMR fix prices. The charged combination and conspiracy affected prices for EUR/USD as set by ECB and WMR Fixes, at which counterparties in the United States purchased and sold U.S. Dollars.

**ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1**

**A TRUE BILL**

_____
GRAND JURY FOREPERSON

Dated: 1/10/17

BRENT SNYDER
Deputy Assistant Attorney General
Antitrust Division
U.S. Department of Justice

MARVIN N. PRICE, JR.
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

PREET BHARARA
United States Attorney
Southern District of New York

JEFFREY D. MARTINO, Chief
New York Office
Antitrust Division
U.S. Department of Justice

CARRIE A. SYME
GEORGE BARANKO
BRYAN C. BUGHMAN
DAVID CHU
LEAH GOULD
ERIC L. SCHLEEF
Attorneys
Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, NY 10278
Tel: (212) 335-8036
Fax: (212) 335-8023
Email: carrie.syme@usdoj.gov

11