**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                             :
UNITED STATES OF AMERICA                                     :
                                                             :
     v.                             :
                                                             :
RICHARD USHER,                                               :     Case No. 1:17-Cr-00019
ROHAN RAMCHANDANI, and                                       :
CHRISTOPHER ASHTON,                                          :
                                                             :
     Defendants.                     :
                                                             :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF**
**<u>DEFENDANTS' MOTION TO DISMISS THE INDICTMENT</u>**

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ....................................................................................................1

II.    FACTUAL BACKGROUND ....................................................................................2

    A.    The Foreign Currency Exchange Market ..............................................2

    B.    Defendants and the Allegations ..............................................................4

III.    LEGAL STANDARD ............................................................................................5

IV.    THE INDICTMENT FAILS TO ALLEGE A RULE OF REASON OR PER SE VIOLATION OF THE SHERMAN ACT ............................................................6

    A.    The Rule of Reason and Per Se Standards for Evaluating Agreements that Restrain Trade ..........................................................6

    B.    The Indictment Fails to State a Per Se Offense ....................................8

        1.    The Indictment Fails to Allege a Horizontal Restraint of Trade ................8

        2.    The Indictment Fails to Allege Restraints Known to be Anticompetitive Based on Considerable Experience ..........................11

        3.    The Indictment Fails to Allege a Plainly Anticompetitive Restraint with No Redeeming Virtue ..............................13

V.    THE INDICTMENT ALLEGES CONDUCT OUTSIDE THE SHERMAN ACT'S EXTRATERRITORIAL SCOPE ....................................................................17

    A.    The FTAIA and Hartford Fire ..............................................................17

    B.    The Alleged Conduct Involves Foreign Commerce and No FTAIA Exception Applies ................................................................19

        1.    The Indictment Alleges Foreign Trade or Commerce ..............................19

        2.    The Alleged Conduct Does Not Satisfy the Import Exception ..................21

        3.    The Alleged Conduct Does Not Satisfy the Domestic Injury Exception...23

    C.    The Alleged Conduct Is Not Actionable Under Hartford Fire ..............................28

    D.    The Sherman Act Does Not Permit Criminal Prosecution of Wholly Foreign Conduct ....................................................................30

VI.    THIS PROSECUTION VIOLATES DUE PROCESS ....................................................32

    A.    Defendants' Conduct Did Not Have a "Sufficient Nexus" to the United States ...33

    B.    Defendants Did Not Receive "Fair Warning" That the Alleged Conduct Was Criminal ....................................................................34

VII.    THE COURT SHOULD ABSTAIN FROM EXERCISING JURISDICTION ON INTERNATIONAL COMITY GROUNDS ....................................................................35

VIII.    CONCLUSION ....................................................................................................37

**TABLE OF AUTHORITIES**

Page(s)

**Federal Cases**

*7 W 57th St. Realty Co., LLC v. Citigroup, Inc.*,
No. 13-cv-981, 2015 WL 1514539 (S.D.N.Y. Mar. 31, 2015)................................................28

*United States v. Ahmed*,
No. 10-cr-131, 2011 WL 5041456 (S.D.N.Y. Oct. 21, 2011) .................................................33

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011).....................................................................................31, 32, 33

*United States v. Anderson*,
326 F.3d 1319 (11th Cir. 2003) .................................................................................30

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*,
654 F.3d 462 (3d Cir. 2011).....................................................................................18, 26

*Bd. of Trade of Chicago v. United States*,
246 U.S. 231 (1918).....................................................................................15

*Bogan v. Hodgkins*,
166 F.3d 509 (2d Cir. 1999).....................................................................................11

*United States v. Bowman*,
260 U.S. 94 (1922).....................................................................................29

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*,
441 U.S. 1 (1979).....................................................................................6, 7, 13, 16

*Bus. Elecs. Corp. v. Sharp Elecs. Corp.*,
485 U.S. 717 (1988).....................................................................................8

*Carrier Corp. v. Outokumpu Oyj*,
673 F.3d 430 (6th Cir. 2012) .................................................................................21

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975).....................................................................................13

*United States v. Coleman Am. Moving Servs., Inc.*,
No. 86-cr-24, slip op. (M.D. Ala. Aug. 8, 1986) .................................................................................8

*In re Deutsche Bank Aktiengesellschaft Sec. Litig.*,
No. 16-cv-3495, 2017 WL 4049253 (S.D.N.Y. June 28, 2017) .................................................................................35

*Dunn v. CFTC*,
    519 U.S. 465 (1997)..........................................................................................12

*United States v. Eckhardt*,
    843 F.2d 989 (7th Cir. 1988) ...........................................................................27

*United States v. Epskamp*,
    832 F.3d 154 (2d Cir. 2016)..............................................................................33

*Eurim–Pharm GmbH v. Pfizer, Inc.*,
    593 F. Supp. 1102 (S.D.N.Y. 1984)............................................................24, 25

*F. Hoffmann-La Roche Ltd v. Empagran S.A.*,
    542 U.S. 155 (2004)................................................................................. *passim*

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    74 F. Supp. 3d 581, 598-600 (S.D.N.Y. 2015) ........................................17, 21, 22

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
    No. 13-cv-7789, 2016 WL 5108131 (S.D.N.Y. Sept. 20, 2016) ................................20, 21, 22

*Gatt Commcn's, Inc. v. PMC Assocs., LLC*,
    No. 10-cv-8, 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011).........................................6, 10, 15

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)....................................................................7

*Hartford Fire Insurance Co. v. California*,
    509 U.S. 764 (1993)................................................................................. *passim*

*United States v. Helgesen*,
    513 F. Supp. 209 (E.D.N.Y. 1981) .....................................................................4

*Hertz Corp. v. City of N.Y.*,
    1 F.3d 121 (2d Cir. 1993).............................................................................6, 13

*Hilton v. Guyot*,
    159 U.S. 113 (1895).......................................................................................34

*United States v. Höegh Autoliners AS*,
    No. 17-cr-505 (D. Md. Sept. 27, 2017), ECF No. 1 ...............................................9

*United States v. Hui Hsiung*,
    778 F.3d 738 (9th Cir. 2015) ........................................................................5, 30

*FTC v. Ind. Fed'n of Dentists*,
    476 U.S. 447 (1986).......................................................................................11

*Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*,
    713 F. Supp. 2d 286 (S.D.N.Y. 2010)................................................................7

*In re Intel Corp. Microprocessor Antitrust Litig.*,
    452 F. Supp. 2d 555 (D. Del. 2006)..........................................................24, 25

*United States v. JTEKT Corp.*,
    No. 13-cr-104 (S.D. Ohio Sept. 26, 2013), ECF No. 2.................................9

*United States v. Kemp & Assocs.*,
    No. 16-cr-403, Slip Op. (D. Utah) (Aug. 28, 2017), ECF No. 96 .............7, 16

*Kruman v. Christie's Int'l PLC*,
    284 F.3d 384 (2d Cir. 2002)..........................................................18, 19, 21

*Leegin Creative Leather Prods. v. PSKS, Inc.*,
    551 U.S. 877 (2007).................................................................8, 11, 12, 16

*Liamuiga Tours v. Travel Impressions, LTD*,
    617 F. Supp. 920 (E.D.N.Y. 1985) ..........................................................25

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11-MDL-2262, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)..................28

*United States v. Lin*,
    No. 09-cr-110 (N.D. Cal. June 10, 2010), ECF No. 8 .................................9

*United States v. Lopez*,
    2 F.3d 1342 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995) .........................17

*Lotes Co. v. Hon Hai Precision Indus. Co.*,
    753 F.3d 395 (2d Cir. 2014)....................................................................23, 24

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)................................................................6, 13, 16

*United States v. Martinez–Hidalgo*,
    993 F.2d 1052 (3d Cir. 1993)...................................................................33

*McLafferty v. Deutsche Lufthansa AG*,
    No. 08-1706, 2009 WL 3365881 (E.D. Pa. Oct. 16, 2009) ......................20, 22

*Med. Arts Pharmacy, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*,
    675 F.2d 502 (2d Cir. 1982)................................................................6, 10, 15

*Minn-Chem, Inc. v. Agrium, Inc.*,
    683 F.3d 845 (7th Cir. 2012) (en banc) ......................................... *passim*

*Mooney v. AXA Advisors, L.L.C.*,
 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014) ...........................................6, 8

*United States v. Morgan*,
 118 F. Supp. 621 (S.D.N.Y. 1953) ...........................................7, 10, 15

*United States v. Mostafa*,
 965 F. Supp. 2d 451 (S.D.N.Y. 2013)..................................................32

*United States v. Naseer*,
 38 F. Supp. 3d 269, 273 (E.D.N.Y. 2014) ............................................33

*NCAA v. Bd. of Regents of Univ. of Okla.*,
 468 U.S. 85 (1984)............................................................................11

*United States v. Nippon Paper Indus. Co.*,
 62 F. Supp. 2d 173 (D. Mass. 1999).....................................25, 26, 28

*United States v. Nippon Paper Indus. Co.*,
 No. 96-2001, 1996 WL 33659179 (1st Cir. Nov. 21, 1996)....................30

*O.N.E. Shipping Ltd. v. Flota Mercante Grancolombiana, S.A.*,
 830 F.2d 449 (2d Cir. 1987)...............................................................34

*United States v. Pirro*,
 212 F.3d 86 (2d Cir. 2000)..................................................5, 21, 25, 27

*Precision Assocs., Inc. v. Panalpina World Transp. (Holding) Ltd.*,
 No. 08-cv-42, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ...............20

*Protective Ass'n v. United States*,
 268 U.S. 588 (1925)...........................................................................14

*United States v. Ramirez*,
 910 F.2d 1069 (2d Cir. 1990)................................................................3

*Russell v. United States*,
 369 U.S. 749 (1962).......................................................................5, 27

*United States v. Saac*,
 632 F.3d 1203 (11th Cir. 2011) ..........................................................33

*United States v. Santos*,
 553 U.S. 507 (2008)...........................................................................31

*United States v. Siddiqui*,
 699 F.3d 690 (2d Cir. 2012)................................................................29

*United States v. Sidorenko,*
    102 F. Supp. 3d 1124, 1129-32 (N.D. Cal. 2015)................................................29

*Sniado v. Bank Austria AG,*
    378 F.3d 210 (2d Cir. 2004)..........................................................................20, 22

*Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.,*
    373 F.3d 57 (1st Cir. 2004)..................................................................................9

*United States v. Suarez,*
    No. 16-cr-453, 2017 WL 2417016 (S.D.N.Y. June 1, 2017).................................33

*In re Sulfuric Acid Antitrust Litig.,*
    703 F.3d 1004 (7th Cir. 2012) ...................................................................7, 11, 12

*In re Sulfuric Acid Antitrust Litig.,*
    743 F. Supp. 2d 827 (N.D. Ill. 2010) ...............................................................10, 15

*Sullivan v. Barclays PLC,*
    No. 13-cv-2811, 2017 WL 685570 (S.D.N.Y. Feb. 21, 2017) ................................35

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006)...........................................................................................6, 13

*United States v. Topco Assocs.,*
    405 U.S. 596 (1972).........................................................................................11

*Turicentro, S.A. v. Am. Airlines Inc.,*
    303 F.3d 293 (3d Cir. 2002).........................................................................20, 22

*United States v. U.S. Gypsum Co.,*
    438 U.S. 422 (1978).....................................................................................13, 26

*In re Vitamin C Antitrust Litig.,*
    837 F.3d 175 (2d Cir. 2016)..............................................................................34

*Waldman v. Palestine Liberation Org.,*
    835 F.3d 317 (2d Cir. 2016)..............................................................................32

*White Motor Co. v. United States,*
    372 U.S. 253 (1963).........................................................................................11

**Federal Statutes**

7 U.S.C. § 2(c)(1)(A) ...........................................................................................12

15 U.S.C. §§ 1, 6a, 15 .................................................................................. *passim*

**Rules**

Fed. R. Crim. P. 7(c) ........................................................................................5

Fed. R. Evid. 201(b)(2) ....................................................................................3

Federal Rule of Evidence 201 ...................................................................4, 35

**Constitutional Provisions**

Fifth Amendment ...............................................................................2, 3, 31, 33

Sixth Amendment ..............................................................................................5

**Other Authorities**

Am. Bar Ass'n, *Model Jury Instructions*, *supra* ...........................................9

H.R. Rep. 97-686 (1982)..................................................................................28

H.R. Rep. No. 97-686 (1982)...........................................................................34

Restatement (Third) of Foreign Relations Law § 403 cmt. F .......................31

Simmons et al., *Where to Draw the Line: Should the FTAIA's Domestic Effects Test Apply in Criminal Prosecutions* ........................................................31

## I.      INTRODUCTION

Christopher Ashton, Rohan Ramchandani, and Richard Usher, citizens and residents of the United Kingdom, were currency traders for banks in London with customers in Europe.  Like virtually all their colleagues in the industry, they used an electronic Bloomberg chat room to trade with each other, exchange market information, and socialize.  Although this chat room, along with all interbank chat rooms, later came under the scrutiny of antitrust regulators, the Serious Fraud Office (SFO)—the United Kingdom's primary prosecuting authority for complex economic crimes—determined, after a thorough investigation, that there was no basis to prosecute Ashton, Ramchandani, or Usher for antitrust or any other offenses.

Never could Ashton, Ramchandani, or Usher have imagined that the *United States* Government would hail them into an American court to face criminal charges for conduct that took place entirely in the United Kingdom, was central to their job responsibilities, and had no perceptible effect in the United States.  But the Government has done just that, advancing a theory of prosecution exceeding the Sherman Act's scope, and crafting an Indictment that is silent on essential aspects of the charged offense and misleading on others.  Defendants waived extradition to come to the United States and fight these baseless charges.  They now move to dismiss the Indictment on four independent grounds:

*First*, the Indictment fails to plead a "per se" Sherman Act violation.  The Sherman Act condemns as per se illegal only (a) restraints among horizontal competitors (b) with which courts have had considerable experience (c) where that experience has shown those restraints to be plainly anticompetitive, and lacking any redeeming virtue.  Because the Indictment does not allege such restraints, it fails to state an offense.

*Second*, the Indictment alleges foreign conduct involving foreign commerce, but fails to plead a "direct, substantial, and reasonably foreseeable effect" in the United States as required by the Foreign Trade Antitrust Improvements Act (FTAIA).  Further, even if the alleged conduct were construed (incorrectly) to be outside the FTAIA's scope, its domestic effects could not have

been "intentional" and "substantial," as required by *Hartford Fire Insurance Co. v. California*, 509 U.S. 764 (1993).

*Third*, the Indictment violates the Due Process Clause of the Fifth Amendment because Defendants lack a "sufficient nexus" to the United States and did not receive "fair warning" that the alleged conduct was criminal.

*Fourth*, even disregarding the Indictment's multiple pleading deficiencies, the Court should decline to exercise jurisdiction on international comity grounds. The charges here involve alleged conduct that took place exclusively in Europe by U.K. nationals, with no intended or foreseeable effects on U.S. commerce. The interested sovereign—the United Kingdom—investigated the same conduct and the same allegations but declined to prosecute. Abstention on grounds of international comity is consequently appropriate.

## II.   FACTUAL BACKGROUND

### A.   THE FOREIGN CURRENCY EXCHANGE MARKET

The foreign currency exchange ("FX") market is a "global" market in which participants buy and sell trillions of dollars' worth of currencies each day. Indict. ¶ 1. Trading volume for the euro/U.S. dollar ("EUR/USD") currency pair "averaged between $400 and $500 billion per day during the period between 2010 and 2012." *Id.* ¶ 2.

Unlike garden-variety stock markets, the FX market has no "single, official exchange." *Id.* ¶ 3. Instead, trading is executed through a variety of decentralized methods, including directly by telephone or electronic message, via brokers, or on electronic platforms. *Id.* ¶¶ 3, 7-8. There are two main types of trades. *Customer* trades are those in which "dealers" (which are banks like Defendants' employers) fill orders placed by customers, who include money managers, hedge funds, importers, exporters, governments, and others. *Interdealer* trades are those in which banks transact with each other, either to acquire currency for filling customer orders or to trade "on the bank's own account." *Id.* ¶¶ 5, 7. Dealers are thus frequent counterparties to each other's currency transactions. *Id.* ¶¶ 7-8.

Dealers employ traders, such as Defendants. *Id.* ¶ 5. Traders are responsible for gathering market information, providing quotes to potential customers, filling customer orders, and making interdealer trades. *Id.* They try to generate profit by selling currencies at higher prices than they paid for them. *Id.*

Traders must manage the risk associated with customer orders. A trader who buys currency is "long" until he sells it; a trader who sells currency that he has not yet bought is "short." *Id.* ¶ 6. In either case, the trader is at risk of the price moving in an unfavorable direction until he makes an offsetting trade. *Id.* Because FX prices "fluctuate rapidly, often from second to second," a trader with a customer order must act quickly to find "liquidity," namely "a source of currency that is ready to be bought or sold," in the interdealer market. *Id.* ¶¶ 6-7.

During the relevant period, Electronic Broking Services ("EBS") was the most widely used platform for EUR/USD traders. *Id.* ¶ 8. EBS is owned and operated by NEX Group plc, a company located in the United Kingdom.[1] On EBS, traders anonymously post bids and offers, and EBS matches counterparties anonymously. *Id.* ¶ 8. Prices on EBS "are set through a continuous auction," in which any individual action may temporarily "contribute to a change in the exchange rate" along with all of the other transactions occurring on the exchange. *Id.*

Traders also transact by communicating directly with each other. During the relevant period, some interdealer trading took place in multiparty electronic chat rooms, other trading in telephone discussions. Chat rooms also served as a place for traders to share views and

---

[1] Defendants request that the Court take judicial notice that EBS is owned by a company headquartered in the United Kingdom because this fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *United States v. Ramirez*, 910 F.2d 1069, 1071 (2d Cir. 1990) ("The district court properly took judicial notice of the fact that New York has no firearms manufacturers and could conclude that the handgun came from interstate commerce."). *See* Tewksbury Decl. ¶ 2 & Ex. A (Reuters profile for NEX Group plc stating that the company is located in the United Kingdom).

information relating to the market, including geopolitical events, economic data, order flows, and market trends.

Currency "fixes" are exchange-rate figures published by independent third parties using nonpublic methods. *Id.* ¶ 9. One EUR/USD fix is the World Markets/Reuters fix (the "WMR fix"), calculated each weekday at 4:00 p.m. Greenwich Mean Time (11:00 a.m. Eastern Time). *Id.* ¶ 10. The WMR fix is administered by The World Markets Company in Edinburgh, United Kingdom.[2] Another EUR/USD fix is the European Central Bank's reference rate (the "ECB fix"), calculated each weekday at 2:15 p.m. Central European Time (8:15 a.m. Eastern Time). *Id.* The ECB fix is determined on a teleconference among European officials, and published by the European Central Bank in Frankfurt, Germany. It is not intended to be used in market transactions.[3]

Sometimes customers place orders for currency to be priced at an unknown fix rate to be determined later in the day. *Id.* ¶ 11. Traders must manage the risk associated with these "fix orders" by predicting where the fix will be set and trading accordingly. *Id.*

## B. DEFENDANTS AND THE ALLEGATIONS

According to the Indictment, Christopher Ashton was a EUR/USD trader for the U.K. affiliate of Barclays PLC ("Barclays") from 2011 to 2015. *Id.* ¶ 15. Rohan Ramchandani was a

---

[2]    Defendants request that the Court take judicial notice of this fact under Federal Rule of Evidence 201. *Supra* note 1; *see* Tewksbury Decl. ¶ 3 & Ex. B (Thomson Reuters press release stating that the "benchmark calculation business was . . . owned and managed by The World Markets Company PLC" until Thomson Reuters acquired it on April 4, 2016); *id.* ¶ 4 & Ex. C (Bloomberg profile stating that The World Markets Company is owned and operated in Edinburgh, United Kingdom).

[3]    Defendants request that the Court take judicial notice of these facts under Federal Rule of Evidence 201. *Supra* note 1; *United States v. Helgesen*, 513 F. Supp. 209 (E.D.N.Y. 1981) (taking judicial notice of the fact that Citibank is F.D.I.C. insured and one of the world's largest banks); *see* Tewksbury Decl. ¶ 5 & Ex. D, at Article 5 (European Union instrument creating mandate for European Central Bank to publish ECB fix rate), ¶ 6 & Ex. E (European Central Bank publication describing its benchmarking system, stating that "euro foreign exchange reference rates are determined . . . in a teleconference between the administrator and the calculation agents," and stating that ECB fix rates "are intended for information purposes only" and are "not intended to be used in any market transactions, whether directly or indirectly").

EUR/USD trader for the U.K. affiliate of Citicorp. ("Citi") from 2004 to 2014. *Id.* ¶ 14. Richard Usher was a EUR/USD trader for the U.K. affiliate of The Royal Bank of Scotland PLC ("RBS") from 2004 to 2010, and for the U.K. affiliate of JPMorgan Chase & Co. ("JPMC") from 2010 to 2013. *Id.* ¶ 13.

The Indictment alleges that these London-based Defendants and coconspirators used a chat room to discuss customer trades and risk positions. *Id.* ¶ 23. According to the Indictment, Defendants agreed in these discussions that they would "suppress and eliminate competition" in the global FX market through two types of behavior:

- "coordinating their bidding, offering, and trading in certain instances," "including, at times, by refraining from trading against each other's interests" (*id.* ¶ 23(b)-(c)); and

- "coordinating their bidding, offering, and trading . . . in and around the time of certain ECB and WMR fixes, for the purpose of increasing, decreasing, maintaining, and stabilizing the price of EUR/USD by the time of the fix" (*id.* ¶ 23(d)-(e)).

## III. LEGAL STANDARD

An indictment must include "a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c). This requires the indictment to "allege the essential elements" of the charged offense. *United States v. Pirro*, 212 F.3d 86, 92-93 (2d Cir. 2000). To do so, the indictment must state facts "specific enough to describe . . . what made the [conduct] in this case criminal." *Id.* at 93. In a case like this one, where a *foreign* conspiracy is alleged to violate Section 1 of the Sherman Act, the indictment must plead that the conduct has a sufficient nexus to the United States. *See Hartford Fire*, 509 U.S. at 796; *United States v. Hui Hsiung*, 778 F.3d 738, 756-57 (9th Cir. 2015).

An indictment that falls short of these requirements violates the Fifth and Sixth Amendments, *Russell v. United States*, 369 U.S. 749, 760-61 (1962), and must be dismissed. Equally, if any part of an indictment relies on allegations that do not adequately allege conduct that could support a conviction, that part of the indictment must be dismissed if it is severable, otherwise the entire indictment fails. *See Pirro*, 212 F.3d at 95 (affirming dismissal of a "portion of [one count] of the indictment"); *Russell*, 369 U.S. 770-72.

## IV. THE INDICTMENT FAILS TO ALLEGE A RULE OF REASON OR PER SE VIOLATION OF THE SHERMAN ACT

### A. THE RULE OF REASON AND PER SE STANDARDS FOR EVALUATING AGREEMENTS THAT RESTRAIN TRADE

Under the Sherman Act, two distinct legal standards govern the legality of agreements that restrain trade: the rule of reason and per se unlawfulness. "Classifying the nature of the restraint alleged—and thus identifying the doctrine to govern the analysis—is critical at the motion to dismiss phase, for it determines what factual material the [accuser] must plead in order to state a claim." *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 498 (S.D.N.Y. 2014).

The lawfulness of a particular restraint of trade is "presumptively" governed by the rule of reason. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Gatt Commcn's, Inc. v. PMC Assocs., LLC*, No. 10-cv-8, 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011). The rule of reason "requires the factfinder to determine whether, under all of the circumstances of the case, including the facts peculiar to the business and the history of, reasons for, and market impact of the restraint, the restrictive practice imposes an unreasonable restraint on competition." *Med. Arts Pharmacy, Inc. v. Blue Cross & Blue Shield of Conn., Inc.*, 675 F.2d 502, 504 (2d Cir. 1982) (citing *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 687-92 (1978)).

The per se standard—the exception to the presumptive rule of reason analysis—deems certain restraints of trade impermissible regardless of their context or details. Because the per se standard is a blunt instrument, courts apply it sparingly. Per se treatment is appropriate only "in the relatively narrow circumstance where courts have sufficient experience with the activity to recognize that it is plainly anticompetitive and lacks any redeeming virtue." *Hertz Corp. v. City of N.Y.*, 1 F.3d 121, 129 (2d Cir. 1993) (collecting cases). For a given practice to warrant per se treatment, it must be "immediately obvious," *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 316 (2d Cir. 2008) ("*MLB*") (internal quotation marks and citations omitted), that the practice "would always or almost always tend to restrict competition and decrease output." *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 19-20 (1979) ("*BMI*").

The specific categories of practices that courts have deemed per se unlawful are limited to naked horizontal agreements to fix prices, rig bids, or allocate customers. *E.g.*, *Model Jury Instructions in Criminal Antitrust Cases* 54 (Am. Bar Ass'n 2009). But these labels are only "a shorthand way of describing certain categories of business behavior to which the per se rule has been held applicable." *BMI*, 441 U.S. at 9. Even agreements among competitors that fix prices in a literal sense are not per se unlawful if they are not plainly anticompetitive. *See id.*; *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1011 (7th Cir. 2012) ("*Sulfuric Acid II*") ("[E]ven price fixing . . . [is] governed by the rule of reason . . . if the challenged practice when adopted could reasonably have been believed to promote" potentially legitimate outcomes (internal quotation marks and citations omitted)); *United States v. Morgan*, 118 F. Supp. 621, 687 (S.D.N.Y. 1953) (applying the rule of reason to underwriting agreements that mandated uniform price schedules, and rejecting the "cliché . . . that any agreement relative to price maintenance is taboo"). Accordingly, "[a]ffixing [per se] labels to alleged conduct is insufficient to invoke per se treatment." *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 296 (S.D.N.Y. 1998). In determining whether the charged conduct states a per se offense, the Court must "not rely on labels applied by the government," and must instead "analyze the substance of the allegations." *See United States v. Kemp & Assocs.*, No. 16-cr-403, Slip Op. at 2-3 (D. Utah) (Aug. 28, 2017), ECF No. 96 (ruling that a restraint of trade in a novel setting, though characterized in the indictment as per se customer allocation, did not state a per se offense), Tewksbury Decl. ¶ 7 & Ex. F.

Consistent with longstanding Antitrust Division policy, the Government here has not charged a rule of reason theory.[4] Consequently, if the Indictment fails to state a per se Sherman

---

[4]     *See* Aug. 4, 2017 U.S. DOJ Letter from Stephen J. McCahey to Defendants, at 3 ("The Indictment in this matter charges a per se violation of 15 U.S.C. Section 1."); Thomas O. Barnett, Ass't Att'y Gen., U.S. DOJ, Address at Fordham Competition Law Inst.'s Annual Conf. on Int'l Antitrust Law & Policy, Criminal Enforcement of Antitrust Laws: The U.S. Model (Sept. 14, 2006), https://www.justice.gov/atr/speech/criminal-enforcement-antitrust-laws-us-model ("[T]he [Antitrust] Division focuses its criminal enforcement only on hard core violations . . . as opposed to the 'rule of reason' . . . analyses used in civil antitrust law . . . ."). In any event, the Indictment

Act violation, it must be dismissed.  *See Mooney*, 19 F. Supp. 3d at 498 (dismissing complaint because the plaintiff "represented at oral argument that he was not pursuing a per se theory" and failed to adequately allege the essential elements of a rule of reason claim).[5]

### B.    THE INDICTMENT FAILS TO STATE A PER SE OFFENSE

#### 1.    The Indictment Fails to Allege a Horizontal Restraint of Trade

The choice between the per se and rule of reason standards requires an initial determination whether the parties to the alleged restraint of trade stand in a "horizontal," "vertical," or mixed relationship.  Only horizontal restraints are subject to per se condemnation.  Because the Indictment does not allege that Defendants are horizontal competitors in the FX spot market, and in fact alleges largely vertical relationships, the Indictment fails.

"Horizontal restraints" are imposed by agreements among competitors on the same side of a market transaction—e.g., between competing sellers.  "Vertical restraints" are agreements between firms on different sides of a market transaction—e.g., between buyers and sellers.  *Bus. Elecs. Corp. v. Sharp Elecs. Corp.*, 485 U.S. 717, 730 (1988).  For example, auto manufacturers that sell competing sedans are in a horizontal relationship.  Car dealers who purchase the sedans are in a vertical relationship with the auto manufacturers, but are in a horizontal relationship with each other as competing buyers of the cars, or as competitors selling cars to end users.  *See, e.g., Mooney*, 19 F. Supp. 3d at 498.

---

fails to allege the elements of a rule of reason violation, such as market-wide anticompetitive effects in a well-defined relevant antitrust market or likelihood that Defendants would have the ability to impose such effects through market power.  *See Integrated Sys. & Power, Inc. v. Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 298 (S.D.N.Y. 2010).

[5]    The only issue now before the Court is whether the Indictment should be dismissed.  The Government's allegations suffice to resolve this issue in favor of dismissal.  Should the Court deny this Motion, Defendants reserve their right, if necessary, to seek a ruling about the appropriate legal standard at other stages of this proceeding—e.g., motions in limine, jury instructions, etc.  *See, e.g., United States v. Coleman Am. Moving Servs., Inc.*, No. 86-cr-24, slip op. at 3-4 (M.D. Ala. Aug. 8, 1986) (deferring until trial the government's motion for a ruling "that the allegations . . . justify resort to a per se analysis," and explaining that "[t]he court must . . . engage in a detailed analysis of the restraint before concluding that a per se approach is justified"), Tewksbury Decl. ¶ 8 & Ex. G.

That distinction is critical here. Although the Indictment relies on the unexplained labels "price fixing" and "bid rigging" (Indict. ¶¶ 18, 22), such restraints can be per se Sherman Act violations only among horizontal competitors. For example, vertical price fixing—an agreement between a manufacturer and its resellers on the prices the resellers will charge—is evaluated under the rule of reason, not the per se rule. *See Leegin Creative Leather Prods. v. PSKS, Inc.*, 551 U.S. 877, 882, 888 (2007) (noting that "[t]he Court has abandoned the rule of *per se* illegality for . . . vertical restraints" given the "appreciated differences in economic effect between vertical and horizontal agreements").

The same distinction applies to other restraints of trade. Bid rigging, in particular, "refers to horizontal [restraints] whereby two or more suppliers (or occasionally purchasers) secretly fix the price at which they will bid." *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 62 (1st Cir. 2004) (citations omitted). By contrast, courts have dismissed claims labeled "bid rigging" when the conduct did not involve competing buyers or sellers. *See id.* (health insurer's grant of exclusive rights to certain pharmacies was not a horizontal arrangement and therefore not a per se offense). Accordingly, the Antitrust Division has previously brought criminal prosecutions in connection with alleged restraints among competitors on the same side of a market—either sellers only (almost universally) or buyers only (occasionally).[6]

---

[6]     *See, e.g.*, Information, *United States v. Höegh Autoliners AS*, No. 17-cr-505 (D. Md. Sept. 27, 2017), ECF No. 1 (charging price-fixing conspiracy among *sellers* of international ocean shipping services for automobiles); Indictment, *United States v. Yeganeh*, No. 15-cr-339 (N.D. Cal. June 25, 2015), ECF No. 1 (charging bid-rigging conspiracy among *buyers* at public real estate auctions); Information, *United States v. JTEKT Corp.*, No. 13-cr-104 (S.D. Ohio Sept. 26, 2013), ECF No. 2 (charging price-fixing conspiracy among *sellers* of bearings for automobiles); Information, *United States v. Geologistics Int'l Mgmt.*, No. 10-cr-268 (D.D.C. Sept. 30, 2010), ECF No. 1 (charging price-fixing conspiracy among *sellers* of freight forwarding services for international air cargo shipments); Superseding Indictment, *United States v. Lin*, No. 09-cr-110 (N.D. Cal. June 10, 2010), ECF No. 8 (charging price-fixing conspiracy among *sellers* of TFT-LCD screens); *see also* Am. Bar Ass'n, *Model Jury Instructions*, *supra*, at 57 (price fixing arises "between two or more competitors"); *id.* at 61 (bid rigging arises "among competitors").

The Indictment here fails to allege that Defendants competed on the same side of the FX spot market, a necessary condition to describing a horizontal restraint among competitors. To the contrary, the Indictment makes clear that Defendants' relationship was not consistently horizontal, but instead often vertical. Indict. ¶ 3. The Indictment explains that FX spot traders such as Defendants "stand ready to fill orders to buy *or* sell . . . currencies upon the request of other market participants." *Id.* (emphasis added). Defendants were thus constantly shifting from one side of the market to the other. Defendants' counterparties in their spot transactions "include other dealers [i.e., banks]," such as the other Defendants' banks. *Id.* Likewise, when traders are executing orders for non-bank customers, they find the liquidity they need through vertical transactions on the "interbank market"—that is, from other traders. *Id.* ¶ 7.

In other words, Defendants were not always buyers, or always sellers, in the FX spot market. Rather, they were regularly potential counterparties of one another, standing in vertical relationships—on different sides of the market—and continually making euro-dollar sales with each other, just as they did with other market participants. *Id.* ¶¶ 3, 7. Restraints of trade in such vertical relationships are not per se Sherman Act offenses. *See Med. Arts Pharmacy*, 675 F.2d at 505 ("[T]he per se rule applies to 'an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves.'" (quoting *Sitkin Smelting & Ref. Co. v. FMC Corp.*, 575 F.2d 440, 446 (3d Cir. 1978))).

The Indictment could not be saved even if, along with the facts describing Defendants' vertical relationships, the Indictment *also* alleged a horizontal relationship among them. This is because cases involving sometimes-competitors who combine in vertical transactions or ventures necessarily require rule of reason analysis. In *Morgan*, for instance, this District explained that the rule of reason applies to securities-underwriting syndicates among competing banks because, in part, each "syndicate [was] an ad hoc common enterprise, limited in number of participants, in purpose, and in duration." 118 F. Supp. at 690. More recently, *Gatt Communications* discussed defendants who were simultaneously "retail distributors of [the manufacturer's] products and the manufacturer's representative in its dealings with other retailers." 2011 WL 1044898, at *3.

10

The court explained that "claims alleging a vertical relationship or mixed vertical and horizontal relationships must be evaluated under the rule of reason." *Id.* at *6. And the district court in the Sulfuric Acid litigation discussed an entire "class of horizontal-vertical hybrids subject to the rule of reason" because of their potential for procompetitive effects. *In re Sulfuric Acid Antitrust Litig.*, 743 F. Supp. 2d 827, 868 (N.D. Ill. 2010) (collecting cases) ("*Sulfuric Acid I*").

Because the Indictment does not allege a horizontal restraint of trade, and instead describes vertical (or, at most, mixed horizontal-vertical) relationships among Defendants, the Indictment fails to state a per se offense.

### 2. The Indictment Fails to Allege Restraints Known to be Anticompetitive Based on Considerable Experience

The Indictment would fail to state a per se Sherman Act violation even if it did allege a purely horizontal relationship among Defendants. A restraint of trade may be deemed per se unlawful "only after courts have had considerable experience with the type of restraint at issue." *Leegin*, 551 U.S. at 886-87. This is because per se condemnation of business practices that never before received per se antitrust scrutiny could inefficiently suppress, and unfairly punish, potentially beneficial business methods. *See Sulfuric Acid II*, 703 F.3d at 1011 (cautioning against per se treatment of "way of doing business . . . in a new and previously unexamined context"). A long line of cases has reinforced and adhered to this limitation on the scope of the per se standard's.[7] Fatally, the Indictment here does not.

---

[7] *See, e.g.*, *FTC v. Ind. Fed'n of Dentists*, 476 U.S. 447, 458-59 (1986) (the Supreme Court has been "slow . . . to extend *per se* analysis to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious"); *NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 104 n.26 (1984) ("*Per se* rules may require considerable inquiry into market conditions before the evidence justifies a presumption of anticompetitive conduct."); *United States v. Topco Assocs.*, 405 U.S. 596, 607-08 (1972) ("It is only after considerable experience with certain business relationships that courts classify them as per se violations of the Sherman Act."); *White Motor Co. v. United States*, 372 U.S. 253, 263 (1963) ("We need to know more than we do about the actual impact of these arrangements on competition to decide whether they . . . should be classified as per se violations of the Sherman Act." (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)); *Bogan v. Hodgkins*, 166 F.3d 509, 514 (2d Cir. 1999) ("Courts have been reluctant to expand the categories of per se illegality.").

The Indictment challenges an alleged restraint that no criminal antitrust case has ever scrutinized. And the Indictment's allegations make clear that this alleged restraint is unlike those with which courts have had "considerable experience." The multi-trillion-dollar FX market is enormous, sophisticated, and decentralized. It operates over-the-counter rather than in a "single, official exchange." Indict. ¶ 3. Its customers deal "directly with dealers" (i.e., banks) or directly with each other. *Id.* Its trades occur on an array of trading platforms. *Id.* ¶ 8. The FX market is a hectic, modernized bazaar, comprising an unlimited number of participants simultaneously conversing, negotiating, and transacting with each other. Each participant shifts "from second to second" between being a buyer, a seller, or both, depending on continually changing market conditions and on each participant's needs in the moment. *Id.* ¶ 6.

The nature of the FX market dictates the business practices of FX traders such as Defendants that are challenged here. Lacking a centralized repository of market trade data as exists in a stock exchange, traders can effectively "quot[e] prices to potential customers" only by constantly "monitoring market information" from counterparties and other sources. *Id.* ¶ 5. And in the absence of a market-wide exchange, traders must canvass an array of sources, including other banks, for liquidity. *Id.* ¶¶ 3, 7. This is why FX traders regularly "fill orders to buy or sell" from each other, and get from each other the liquidity they need to execute their own customers' orders. *Id.* Monitoring market information, including by direct communications with each other, thus allows traders to quote more informed and realistic prices; and transacting with other traders allows them to execute their customers' orders more efficiently.[8] *Id.* ¶¶ 6, 7.

The explanation in the Indictment of the unique traits of FX trading go to the heart of the allegations against Defendants. The Indictment accuses Defendants of sharing information "in telephone calls and electronic messages, including . . . near-daily conversations in a private

---

[8]    The FX spot market is not subject to rules and regulations analogous to those that govern securities trading, such as regulations regarding exchanging information or the use of such information. *See* 7 U.S.C. § 2(c)(1)(A) (exempting most transactions in "foreign currency" from the CFTC's jurisdiction); *Dunn v. CFTC*, 519 U.S. 465, 469 (1997) (discussing scope of "foreign currency" exemption).

electronic chat room." *Id.* ¶ 23(a). These information-exchanges concerned supply and demand in the market, including "customer orders and trades; customer names; and risk positions." *Id.* And the Indictment throughout alleges that Defendants "coordinat[ed] their bidding, offering, and trading" in the FX market. *Id.* ¶ 23(c), (d). Yet a constant stream of communication among traders, accompanying and arranging frequent transactions among them, are the very tasks that allow FX traders to provide their services most efficiently.

The Court should therefore reject the Indictment's per se attack on a "way of doing business . . . in a new and previously unexamined context." *Sulfuric Acid II*, 703 F.3d at 1011. Courts lack the "considerable experience" with the practices intrinsic to FX trading that is necessary to support a conclusion that the conduct alleged here is per se unlawful. *Leegin*, 551 U.S. at 886-87; *Dagher*, 547 U.S. at 5. Given the courts' lack of experience, the Indictment cannot state a per se offense.

### 3. The Indictment Fails to Allege a Plainly Anticompetitive Restraint with No Redeeming Virtue

For related reasons, it is not "immediately obvious," *MLB*, 542 F.3d at 316, that the restraints of trade alleged in the Indictment "would always or almost always tend to restrict competition and decrease output." *BMI*, 441 U.S. at 19-20.[9] The Indictment thus fails to allege conduct that is "plainly anticompetitive and lacks any redeeming virtue." *Hertz*, 1 F.3d at 129. At least three aspects of the Indictment's allegations compel this conclusion.

#### i. The Indictment Describes Procompetitive Information-Sharing

To begin, the Indictment centers on Defendants' exchanges of information. It alleges that Defendants "participat[ed] in telephone calls and electronic messages, including engaging in near-daily conversations in a private electronic chat room." Indict. ¶ 23(a). And the

---

[9]     Indeed, when U.K. enforcement authorities scrutinized the practices alleged here, they discerned no basis for any charges and determined that no further amount of investigation could cure the defects. *See infra* section VII.

Indictment's theory of "coordination" among Defendants revolves around their discussions of their trading, their "positions," and their "customer orders." *Id.*

The Supreme Court has recognized, however, that information-sharing carries "redeeming virtue" and is not "plainly anticompetitive." *Hertz*, 1 F.3d at 129. "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive." *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978). As a result, "the dissemination of price information is not itself a *per se* violation of the Sherman Act." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975).

The discussions of market trends and orders in the Indictment are precisely the types of information that FX spot traders need in order to trade effectively because the FX spot market is over the counter. Indict. ¶ 3. By exchanging this information, traders improve their access to the currency necessary to execute customer orders. *See Id.* at ¶ 7 (traders execute customer orders by finding "liquidity" in the "interdealer market"). The same types of information also enable traders to combat predatory market practices, such as the customer practice of misrepresenting the overall size of a customer's order—and thus the bank's risk—to obtain better pricing. *See Cement Mfrs.' Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925) ("dissemination of information which tends to prevent . . . fraudulent contracts" does not violate the Sherman Act). And traders better informed about market conditions can better decide *when* to trade—i.e., how to more efficiently manage their risk—and can therefore offer better prices to customers. *See* Indict. ¶ 6 (because "EUR/USD exchange rates can fluctuate rapidly, often from second to second," traders "must . . . strategically manage their risk positions . . . by buying or selling when price is favorable"). "[M]onitoring market information" is thus a key function of spot trading. *Id.* ¶ 5.

Because the essence of the Indictment's allegations relate to procompetitive information sharing, rather than any "plainly anticompetitive" restraint, the Indictment does not state a per se offense.

### ii. *The Indictment Describes Procompetitive, Vertical, Liquidity-Sourcing Transactions*

The second aspect of the alleged conduct that carries "redeeming virtue," rather than being "plainly anticompetitive," is Defendants' frequent transactions with each other. The Indictment alleges that Defendants stood "ready to fill orders to buy or sell . . . upon the request of market participants, which include other dealers [i.e., banks] . . . ." Indict. ¶ 3. To fill their orders (either from other banks or from other customers), Defendants needed "liquidity—that is, a source of currency that is ready to be bought or sold." *Id.* ¶ 7. They found the necessary liquidity in the "interdealer market, also known as the interbank market." *Id.* Defendants thus continually entered vertical, buy-sell transactions in which they sold each other currency and customer orders. The Indictment alleges that they thereby "coordinat[ed]" their trading. *Id.* ¶ 23(c)-(d).

Every market participant engages in "restraints of trade" on a regular basis. *See Bd. of Trade of Chicago v. United States*, 246 U.S. 231, 238 (1918) (every agreement restrains trade but only unreasonable restraints violate the Sherman Act). But vertical buy-sell transactions are not the restraints of trade that the Sherman Act is intended to curb. *See Med. Arts Pharmacy*, 675 F.2d at 505 ("[T]he per se rule applies to 'an agreement to fix the price to be charged in transactions with third parties, not between the contracting parties themselves.'" (quoting *Sitkin Smelting.*, 575 F.2d at 446)). Again, vertical transactions—even among sometimes-competitors—require rule of reason analysis. *See Morgan*, 118 F. Supp. at 689; *Gatt Commcn's*, 2011 WL 1044898, at *3; *Sulfuric Acid I*, 743 F. Supp. 2d at 868.

The vertical transactions that are part of an FX trader's job carry an obvious potential for "redeeming virtue." In some instances, traders with large orders in opposite directions (i.e., one buying euros and another selling) can execute their orders most efficiently by dealing with each

other, and thus obviating their respective needs for piecemeal transactions with numerous counterparties. In other instances, a large customer order may stretch an FX trader's access to liquidity or appetite for risk. The option of reallocating a portion of that order to a sometimes-competitor allows assets, risk, and work to flow to their most efficient uses. *See Morgan*, 118 F. Supp. at 640 (explaining that competing bankers marketed securities in cooperative syndicates because "[n]o single underwriter could have borne alone the underwriting risk involved in the purchase and sale of a large security issue"). Such risk-reallocation trades tend to improve execution and prices, while leaving overall market supply and demand undisturbed.

The alleged "coordination" among Defendants through vertical transactions is thus equally inappropriate for per se condemnation, because it is not "plainly anticompetitive."

### iii.    The Indictment Does Not Describe "Manifestly Anticompetitive" Conduct

Finally, it is not "immediately obvious," *MLB*, 542 F.3d at 316, from the face of the Indictment that the restraints alleged would have "manifestly anticompetitive effects"—i.e. would raise prices or lower output in the FX Spot Market. *Leegin*, 551 U.S. at 886 (quotation marks omitted); *see also*, *BMI*, 441 U.S. at 19-20 (per se illegal conduct must "facially . . . always or almost always tend to restrict competition and decrease output"). To the contrary, the Indictment makes clear that Defendants' alleged conduct possibly affected the FX spot market in, at worst, mixed and unpredictable ways.

In particular, the Indictment alleges only that the restraint may "increas[e], decreas[e], maintain[], [or] stabiliz[e]" price at any given time. Indict. ¶ 23; *see also id.* ¶¶ 18, 22. As the Indictment acknowledges, Defendants' conduct may therefore "benefit, harm, or be neutral" to other FX spot market participants, depending on their market position at the moment. *Id.* at ¶ 8. For example, assuming Defendants contributed to an increased EUR/USD "fix" at a particular time, participants selling euros at that fix would have *benefited*. *Id.* ¶¶ 6, 8. Given that such effects would be, at worst, mixed, the per se rule has no application here. *MLB*, 542 F.3d at 316.

In any event, the Indictment acknowledges that Defendants had, at most, limited ability to actually change prices in the FX market, stating that their bidding decisions "*can* cause" and can "*contribute* to a change in the exchange rate." *Id.* ¶ 8 (emphasis added). And the Indictment nowhere alleges that Defendants did (or could have) affected the levels of USD or EUR exchanged in the market.[10] Thus, even if the alleged restraint might arguably tend to lead to different prices or liquidity in the market at a moment in time, the Indictment does not (and cannot) state that prices would always be higher, output would always be lower (much less sustainably so), and customers would always be worse off due to the alleged restraint. This deficiency is fatal to the Indictment's per se theory. *MLB*, 542 F.3d at 316; *Kemp*, No. 16-cr-403, Slip Op. at 2-3, Tewksbury Decl. ¶ 7 & Ex. F (ordering conduct charged in indictment subject to rule of reason).

## V. THE INDICTMENT ALLEGES CONDUCT OUTSIDE THE SHERMAN ACT'S EXTRATERRITORIAL SCOPE

The Indictment also fails to allege actionable conduct under the FTAIA and *Hartford Fire*, which create additional, essential elements for cases involving foreign conduct. This provides a discrete basis for dismissal. *See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 598-600 (S.D.N.Y. 2015) ("*Forex I*") (dismissing complaints by foreign plaintiffs for failure to state actionable claims under the FTAIA); *United States v. Lopez*, 2 F.3d 1342, 1368 (5th Cir. 1993), *aff'd*, 514 U.S. 549 (1995) (explaining that "[a]n indictment that fails to allege a commerce nexus, where such a nexus is a necessary element of the offense, is defective").

### A. THE FTAIA AND *HARTFORD FIRE*

The FTAIA imposes limits on the Sherman Act's application to conduct involving foreign commerce.[11] The statute first provides that the Sherman Act "shall *not* apply to conduct

---

[10]     Since Defendants are not alleged to control the supply of dollars or euros, it is not obvious, and the Indictment nowhere explains, how their conduct would be able to sustainably reduce "output" of any good or service (much less currency itself).

[11]     In full, the FTAIA, 15 U.S.C. § 6a, reads:

involving trade or commerce . . . with foreign nations." 15 U.S.C. § 6a (emphasis added). This provision "lays down a general rule placing *all* . . . activity involving foreign commerce outside the Sherman Act's reach." *F. Hoffmann-La Roche Ltd v. Empagran S.A.*, 542 U.S. 155, 162 (2004).

The FTAIA then "brings . . . [foreign] conduct back within the Sherman Act's reach," *id.*, on two conditions: the conduct at issue must have a "'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or . . . export commerce," *id.* (quoting 15 U.S.C. § 6a(1)); and that conduct must produce an "effect [that] gives rise to a claim under" the Sherman Act. 15 U.S.C. § 6a(2). Foreign conduct with a direct, substantial, and reasonably foreseeable U.S. effect that gives rise to a Sherman Act claim is said to fall within the FTAIA's "domestic injury" exception. *Empagran*, 542 U.S. at 166.

The FTAIA does not apply to "import trade or import commerce." 15 U.S.C. § 6a(2); *Minn-Chem, Inc. v. Agrium, Inc.*, 683 F.3d 845, 854 (7th Cir. 2012) (en banc). To fit within this "import exception," conduct must be "directed at a [U.S.] import market." *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds by Empagran*, 542 U.S. at 173. Otherwise stated, for the import exception to apply, a defendant's behavior must "target import goods or services" and "'directly increase or reduce'" imports into the United States.

---

[The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

(1)     such conduct has a direct, substantial, and reasonably foreseeable effect—

     (A)     on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

     (B)     on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2)     such effect gives rise to a claim under the provisions of this Act [15 U.S.C. §§ 1 et seq.], other than this section.

If [the Sherman Act] applies to such conduct only because of the operation of paragraph (1)(B), then [the Sherman Act] shall apply to such conduct only for injury to export business in the United States.

*Animal Sci. Prods., Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d Cir. 2011) (citation omitted).

Foreign conduct removed from the FTAIA by either of its exceptions—the domestic injury exception or the import exception—remains "subject to the Sherman Act's general requirements for effects on commerce." *Minn-Chem*, 683 F.3d at 854-55. This means that such conduct is actionable only if it "was meant to produce and did in fact produce some substantial effect in the United States." *Hartford Fire*, 509 U.S. at 796.

Here, the Indictment charges three British citizens, working for banks in London, with conspiring to manipulate a "global market" through trades made entirely outside the United States. These allegations are not actionable for three reasons. *First*, the alleged conduct is "trade or commerce . . . with foreign nations" that satisfies neither the FTAIA's import exception nor its domestic injury exception. *Second*, even if the allegations satisfied a FTAIA exception, they still would fail *Hartford Fire*'s demand for intended, substantial U.S. effects. *See* 509 U.S. at 796. And *third*, even if the facts alleged could not satisfy the extraterritoriality rules that courts have crafted in *civil* antitrust cases, the Sherman Act's *criminal* provisions, properly construed, do not encompass wholly foreign conduct.

### B. THE ALLEGED CONDUCT INVOLVES FOREIGN COMMERCE AND NO FTAIA EXCEPTION APPLIES

The Indictment charges three London-based traders with conspiring to manipulate the FX market through their trading in Europe. The alleged conduct (1) constitutes "trade or commerce . . . with foreign nations," (2) is not "import" trade or commerce, and (3) does not satisfy the domestic injury exception. This conduct thus falls "outside the Sherman Act's reach." *Empagran*, 542 U.S. at 162.

### 1. The Indictment Alleges Foreign Trade or Commerce

Under the FTAIA's "general rule," the Sherman Act does not apply to "'wholly foreign transactions'" where "the anticompetitive conduct at issue is foreign." *Empagran*, 542 U.S. at 163 (quoting H.R. 5235, 97th Cong., § 1, at 9-10 (1st Sess. 1981)). Here, the Indictment alleges

only foreign transactions in foreign commerce. At all relevant times, Defendants worked and traded in London for London banks. Indict. ¶¶ 13-15. The Indictment alleges that Defendants conspired to "fix[]" the "global" "FX Spot Market"—an over-the-counter market involving only bilateral trades involving at least one non-U.S. currency. *Id.* ¶¶ 1, 3, 18. The Indictment does not allege that Defendants ever engaged in, much less conspired over, transactions in a U.S. domestic market. And Defendants allegedly manipulated the ECB and WMR "fixes," which are "benchmarks" calculated abroad by foreign companies or banks. *Id.* ¶¶ 9, 23(d); *supra* nn. 2-3. A conspiracy by foreigners to fix prices in a foreign market is paradigmatic conduct "involving" foreign commerce. *Minn-Chem*, 683 F.3d at 856 ("an international cartel in a commodity . . . plainly involves foreign commerce"); *Kruman*, 284 F.3d at 395-96 (relevant transactions in conspiracy involving foreign auctions were foreign commerce).

Although the Indictment alleges that some of Defendants' counterparties were "located . . . in the United States," Indict. ¶ 25, it nowhere alleges that the *transactions* with those counterparties occurred in the United States. To the contrary, the only trading platform identified in the Indictment, EBS, is owned and operated by a company located in the United Kingdom. Regardless, the FTAIA governs *all* "conduct involving trade or commerce (other than import trade or import commerce) with foreign nations," 15 U.S.C. § 6a, even if that conduct involves transactions with U.S. persons. *See, e.g.*, *Sniado v. Bank Austria AG*, 378 F.3d 210, 212 (2d Cir. 2004) (applying the FTAIA to claims by New York resident allegedly harmed by a conspiracy among European banks to charge supracompetitive FX fees); *In re Foreign Exchange Benchmark Rates Antitrust Litig.*, No. 13-cv-7789, 2016 WL 5108131, at *13 (S.D.N.Y. Sept. 20, 2016) (Schofield, J.) ("*Forex II*") (applying the FTAIA to class of plaintiffs domiciled in the United States that transacted with a foreign trading desk of a defendant); *McLafferty v. Deutsche Lufthansa AG*, No. 08-1706, 2009 WL 3365881, at *3 (E.D. Pa. Oct. 16, 2009) (applying the FTAIA to plaintiff who was in the United States when she purchased tickets from foreign airlines).

That certain foreign currency transactions on the global FX spot market may have later "settled" in the United States or caused U.S. dollars to "transfer" or "flow" through U.S. bank accounts, Indict. ¶¶ 12, 26-27, is beside the point. The purchase and sale of euros denominated in dollars, which is all the EUR/USD FX market involves, is no different from any other market denominated in dollars such as oil, copper, or wheat. The fact that dollars are used in transactions in foreign commerce, or that the dollar settlements of those purchases flow through accounts at the Federal Reserve, does not exempt those transactions from the requirements of the FTAIA. *See, e.g.*, *Precision Assocs., Inc. v. Panalpina World Transp., (Holding) Ltd.*, No. 08-cv-42, 2013 WL 6481195, at *24 (E.D.N.Y. Sept. 20, 2013) ("Even if the purchases were made with funds from United States bank accounts, that alone does not change the fact that defendants' antitrust misconduct was a conspiracy to fix the price of [services abroad] . . . ."); *Turicentro, S.A. v. Am. Airlines Inc.*, 303 F.3d 293, 304 (3d Cir. 2002) (transacting in U.S. dollars or using U.S. computers to effectuate a transaction does not remove conduct from the FTAIA's general rule). To hold otherwise would subject every transaction in the world settled from a U.S. bank account to the Sherman Act, which is not the law. *Turicentro*, 303 F.3d at 304 ("[U]nder plaintiffs' interpretation, a legion of activities transacted by foreign merchants with some connection to instruments in the United States economy . . . would constitute 'import commerce.'").

### 2. The Alleged Conduct Does Not Satisfy the Import Exception

Nor does the Indictment allege conduct satisfying the FTAIA's exception for "import" trade or commerce. *Empagran*, 542 U.S. at 163. Although the Indictment asserts that the "charged combination and conspiracy involved . . . U.S. import trade or commerce in EUR/USD transactions," Indict. ¶ 24, that bald assertion cannot sustain the Government's charges. *See Pirro*, 212 F.3d at 93. More fundamentally, the Indictment nowhere describes actual import commerce, namely "transactions in which the seller is located abroad while the buyer is domestic and the goods flow into the United States." *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 438

n.3 (6th Cir. 2012) (quoting IB Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272i4, at 290).

Indeed, this District has already ruled—twice—that FX trades executed by London traders do not involve import trade or commerce. In the *Forex* multidistrict litigation, Judge Schofield first explained: "That . . . some currency that was bought and sold in this case[] may ultimately have been imported by individuals in the United States did not relieve the . . . burden of showing that the defendants *specifically targeted* an import market in the United States." *Forex I*, 74 F. Supp. 3d at 600 (emphasis added) (quotation marks omitted). Because plaintiffs' theory there was that "manipulation of the Fix . . . impacted currencies worldwide," they could not also maintain that the conduct in question was "directed at the U.S. import market," notwithstanding the "exchange of bank deposits in the respective countries." *Id.* at 599.

Subsequently, the Court ruled the import exception inapplicable "to transactions . . . where a *U.S.-domiciled* [plaintiff] operating abroad transacted with a foreign desk of a Defendant." *Forex II*, 2016 WL 5108131, at *13 (emphasis added). The Court explained that, "[i]n such situations, the transactions occurred exclusively abroad, with no 'importation' of interests in FX Instruments into the United States." *Id.*; *see also Kruman*, 284 F.3d at 395-96 ("[T]he focus of this case is the charging of fixed commissions . . . not the trade in and subsequent movement of the goods that were purchased and sold."); *Turicentro*, 303 F.3d at 304 ("Although defendants paid commissions in United States dollars, neither the payments nor their calculations on computers based in the United States are properly considered 'imports.' No items or services were brought into the United States by the payments alone.").

The same reasoning applies here. The Indictment does not identify goods, currency, or anything else being brought into the United States—and certainly no services or goods were brought into the U.S. by payments or settlements in the U.S. alone. Moreover, the Indictment fails to allege that Defendants "directed" their trades at *anyone*—nor could they have, since EBS "anonymously" matches counterparties. Indict. ¶ 8. Thus, just as the Court concluded in *Forex I*

and *Forex II*, the conduct alleged here did not "specifically target[] an import market in the United States." *Forex I*, 74 F. Supp. 3d at 599-600.

### 3. The Alleged Conduct Does Not Satisfy the Domestic Injury Exception

Because the Indictment charges conduct involving non-import foreign commerce, it must satisfy the FTAIA's domestic injury exception. The charged conduct is therefore actionable only if it has a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce. 15 U.S.C. § 6a. The Indictment does not explain how Defendants' conduct could do so.

The only asserted basis for a "direct, substantial, and reasonably foreseeable effect" on U.S. commerce is the allegation that some of Defendants' counterparties were Americans who purchased or sold currency at prices based on the allegedly manipulated "ECB and WMB Fixes." Indict. ¶ 28. But the mere fact that U.S. persons pay supracompetitive prices in a *foreign* transaction does not meet the domestic injury exception. *See Sniado*, 378 F.3d at 212; *Forex II*, 2016 WL 5108131, at *13; *McLafferty*, 2009 WL 3365881, at *4.

As explained below, even assuming the Government meant to allege that Defendants' conduct affected prices in as-yet-unidentified FX spot transactions within the United States (not involving Defendants themselves), the Indictment itself makes clear that such an effect would not be direct, substantial, or reasonably foreseeable.

### i. No "Direct" Effect

Conduct has a "direct" effect in the United States where "there is a reasonably proximate causal nexus between the [foreign] conduct and the [U.S.] effect." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 398, 410 (2d Cir. 2014). A "House-That-Jack-Built situation in which action in a foreign country filters through many layers and finally causes a few ripples in the United States" does not suffice. *Minn-Chem*, 683 F.3d at 860. "Whether the causal nexus between foreign conduct and a domestic effect is sufficiently 'direct' under the FTAIA in a particular case will depend on many factors, including the structure of the market and the nature of the commercial relationships at each link in the causal chain." *Lotes*, 753 F.3d at 413.

"[C]ourts ask, for example, 'whether the injury that resulted was within the scope of the risk created by the defendant's [wrongful] act; whether the injury was a natural or probable consequence of the [conduct]; whether there was a superseding or intervening cause; [and] whether the [conduct] was anything more than an antecedent event without which the harm would not have occurred.'" *Id.* at 412 (second, third, and fifth alterations in original) (citation omitted).

Here, the allegations of fix manipulation, Indict. ¶ 23(d)-(e), illustrate the attenuated causal chain on which the Government's theory rests. These allegations assume that (1) Defendants coordinated their trading in connection with certain fix orders and strategically traded near the time that the fix was calculated (*id.* ¶¶ 11, 23(d)-(e)); (2) these trades interacted with thousands of other trades to materially change demand for one of the relevant currencies at the time the fix is calculated (*id.* ¶¶ 6, 8); (3) this demand shift increased the *probability* that the market would move in a favorable direction, as market prices are determined by numerous factors and "fluctuate rapidly" (*id.*); (4) the market price did, in fact, move in a direction favorable to Defendants for transactions executed at the time the fix is calculated; (5) these transactions were captured by a fix-setting entity located in Europe (*id.* ¶ 10; *supra* nn. 2-3); (6) the fix-setting entity *independently* factored these transactions into its estimate of the historical exchange rate in the worldwide market (*id.*); and (7) customers worldwide (and *possibly* in the United States) transacted at the allegedly altered fix price, and were either harmed or benefited depending on their position (*id.* ¶¶ 8, 28).

This avalanche of inference is exactly the type of "House-That-Jack-Built situation" that falls short of proximate causation. *Minn-Chem*, 683 F.3d at 860. Indeed, given the numerous "superseding or intervening cause[s]," coupled with the large and complex "structure of the market and the nature of the commercial relationships at each link in the causal chain," any supposed harm to competition in the United States cannot plausibly be cast as a "natural or probable consequence" of their conduct. *Lotes*, 753 F.3d at 412-13; *see In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 560-61 (D. Del. 2006) ("*Intel*") (alleged

domestic effects were not "direct" because they were "premised on a multitude of speculative and changing factors . . . including market conditions, the cost of financing, supply and demand, . . . and world-wide economic and political conditions"); *Eurim–Pharm GmbH v. Pfizer, Inc.*, 593 F. Supp. 1102, 1106-07 (S.D.N.Y. 1984) (alleged Europe-based price-fixing and market-allocation scheme's "spillover effect" on U.S. drug prices was not direct, substantial, and reasonably foreseeable).

Likewise, for the allegations that Defendants "refrained" from trading at certain times so as not to harm each other's interests, Indict. ¶¶ 23(b)-(c), no allegations are made that any customers are harmed, let alone in the United States—at best the Indictment could suggest wholly indirect effects on U.S. currency markets. The Indictment alleges only that any such "individual action[]" by one of Defendants "*can* cause or *contribute* to a change in" FX prices, *id.* ¶ 8 (emphasis added)—an allegation that fails to describe even but-for causation, much less proximate causation. And here, too, the Indictment concedes that FX spot prices "are set through a continuous auction" in which rates can "fluctuate rapidly, often from second to second" because of the multitude of "traders from various dealers making offers and bids and accepting offers and bids." *Id.* ¶¶ 6, 8. Accordingly, this theory of anticompetitive effects is no more direct than the "fix" theory. *Intel*, 452 F. Supp. 2d at 560-61; *Eurim–Pharm GmbH*, 593 F. Supp. at 1106-07; *Liamuiga Tours v. Travel Impressions*, *LTD*, 617 F. Supp. 920, 924 (E.D.N.Y. 1985) (downstream "anti-competitive effect" on "American consumers of Caribbean tour packages" resulting from higher prices passed on by tour operators was not a direct effect).

### ii.     No "Substantial" Effect

The Indictment also does not adequately allege that the charged conduct had any "substantial" effect in the United States. 15 U.S.C § 6a. For example, the Indictment is silent on the volumes traded by Defendants, and certainly does not suggest that the trades of *three to four* individuals in Europe *out of thousands* of counterparties were more than a very small percentage of the $400 to $500 billion traded daily in the EUR/USD spot market. *See* Indict. ¶¶ 1, 2. Defendants' trading was thus plainly insubstantial. *See United States v. Nippon Paper Indus.*

*Co.*, 62 F. Supp. 2d 173, 195 (D. Mass. 1999) (finding no "substantial" effect where the alleged conspirators were "an 'insignificant' force in the [U.S.] market place"); *cf. Minn-Chem*, 683 F.3d at 856, 858 (finding a "substantial" effect where a "global cartel" controlled 71% of the global market and the majority of the U.S. market and caused "the price of potash [to] increase[] by over 600%").

Whatever the volume of Defendants' transactions, the Indictment *nowhere* alleges—even in conclusory fashion—that Defendants had a substantial impact on FX spot prices in a U.S. market (or any other market). To the contrary, the Indictment merely asserts the alleged conspiracy *may have* "affected prices for EUR/USD," not that the effect, if one even existed, was *substantial*. Indict. ¶ 28. This omission is fatal to the Indictment. *Pirro*, 212 F.3d at 93.

Moreover, other allegations in the Indictment confirm that any effect of Defendants' foreign conduct on the United States would be insubstantial. For example, the Indictment alleges that prices fluctuate rapidly in a "continuous auction" influenced by a cascade of trades throughout the day. Indict. ¶¶ 1, 6, 8. Consequently, at worst, the alleged conspiracy briefly delayed or accelerated a small subset of trades in an immense market. *Id.* And at best any particular trade admittedly only "can cause" or could "contribute" to FX prices—along with all of the other trades occurring in the market. *Id.* at ¶ 8. Because the Indictment concedes that Defendants' conduct could have had only an ephemeral impact on a subset of the global FX spot market, it fails to allege a substantial effect. *See Nippon Paper*, 62 F. Supp. 2d at 195 (that other companies "continued to aggressively compete" in the allegedly fixed market disproved a substantial effect, particularly in light of defendants' small share).

### iii.     No "Reasonably Foreseeable" Effect

Nor would such a negligible, speculative effect be "reasonably foreseeable." *See Animal Sci. Prods.*, 654 F.3d at 471 ("[T]he relevant inquiry is whether the alleged domestic effect would have been evident to a reasonable person making practical business judgments."). A trader sitting in London, filling fix orders for European customers, executing transactions in the United Kingdom, trading a necessarily tiny fraction of the net volume in a vast market could not

have reasonably "foreseen" that he would be having a significant impact on prices for customers in the United States. *See Minn-Chem*, 683 F.3d at 856 ("an international cartel with a grip on 71% of the world's supply of a homogeneous commodity" was one that could foreseeably affect U.S. prices. Indeed, the Indictment admits that any "change in the exchange rate" to which Defendants' trades "contribute . . . *may benefit*, harm or be *neutral*" to other anonymous FX market participants, wherever they may be. Indict. ¶ 8 (emphasis added).

Moreover, a *criminal* antitrust prosecution requires more than mere objective foreseeability. It requires actual "knowledge of [the] probable consequences and having the requisite anticompetitive effects" in the United States. *U.S. Gypsum Co*., 438 U.S. at 443 (ruling that "criminal offenses defined by the Sherman Act should be construed as including intent as an element"); *see also Hartford Fire*, 509 U.S. at 796 (requiring intent to impose substantial effect in United States for foreign conduct to be actionable).

The Indictment therefore fails to allege conduct that would have had a "reasonably foreseeable" *negative* effect on U.S. commerce, and the domestic injury exception does not apply.

### iv. *Any U.S. Effects* **Admittedly** *Do Not Give Rise to Any Identifiable Portion of the Charged Conduct*

For the reasons described above, the Indictment does not allege the effects on U.S. commerce necessary to state a Sherman Act violation under the FTAIA. But even if some portion of the charged conduct did have the required effect, the Indictment is concededly *not* limited to those effects. To the contrary, it states: "The charged combination and conspiracy had a direct, substantial, and reasonably foreseeable effect on interstate and U.S. import trade or commerce in EUR/USD transactions and that effect, *in part*, gives rise to this charge." Indict. ¶ 28 (emphasis added).

Any part of the Indictment that charges conduct that does not violate the Sherman Act because that conduct is foreign conduct with solely foreign effects must be dismissed. *See Pirro*, 212 F.3d at 93-95 (portion of an indictment not based on chargeable conduct must be dismissed);

*see also Empagran*, 542 U.S. at 159 (foreign conspiracy not reachable by the Sherman Act to the extent of its foreign effects, even if U.S. effects are addressable); *Minn-Chem*, 683 F.3d at 856 ("[R]egardless of whether the case is brought by the government or in private litigation, it is essential to meet the criteria spelled out by the FTAIA."). Here, because the Indictment does not distinguish between the "part" of the charged conduct that is purportedly grounded in U.S. effects and the "part" that concededly is not (Indict. ¶ 28), the Indictment must be dismissed in its entirety.[12] *Russell*, 369 U.S. at 770-72 (indictment invalid because it left unclear whether grand jury had indicted on the basis of chargeable conduct); *United States v. Eckhardt*, 843 F.2d 989, 997 (7th Cir. 1988) (dismissal appropriate if legally invalid theory is not "easily separable" from a potentially valid theory).

### C.    THE ALLEGED CONDUCT IS NOT ACTIONABLE UNDER *HARTFORD FIRE*

Even if the Indictment is interpreted to allege conduct exempt from the FTAIA under the import or domestic injury exceptions, the Indictment remains "subject to the Sherman Act's general requirements for effects on commerce." *Minn-Chem*, 683 F.3d at 854. *Hartford Fire* articulates these requirements for foreign conduct, holding that no conduct is actionable unless it "was meant to produce and did in fact produce some substantial effect in the United States." 509 U.S. at 796. As explained in section V.B.3, the Indictment offers no cogent theory of how the

---

[12]    In the alternative, at a minimum the allegations related to the ECB fix do not satisfy FTAIA and *Hartford Fire*, and should be dismissed. *See Pirro*, 212 F.3d at 93-95 (even if the Court determines that some portion of the Indictment adequately alleges a Sherman Act violation, the Court must dismiss other portions of the Indictment that do not state a violation). Based on the limited facts in the Indictment, along with facts of which the Court may take judicial notice, *see supra* note 3, the Indictment's admission in paragraph 28 that it is based in part on conduct with no U.S. effects likely refers to the allegations relating to the ECB fix manipulation. The ECB fix is set by the European Central Bank and central banks in the Eurozone (and not by the U.S. Federal Reserve). The European Central Bank explicitly states that its fix is not intended to be used to set prices in market transactions. The ECB fix is set through a confidential teleconference among European officials. The fix is based on trading at 8:15 am Eastern (14:15 CET), before significant trading in the United States has begun. And the Indictment does not allege that any U.S.-located banks take ECB fix orders from U.S. customers. Thus, any alleged manipulation of the ECB fix would have had, at most, an indirect, de minimis effect in the United States.

alleged conduct had *any* effect on U.S. commerce, let alone a substantial one.  That omission

requires dismissal.  *See Nippon Paper*, 62 F. Supp. 2d at 195 (dismissing Indictment post-trial

for lack of evidence that foreign cartel had substantial effect on U.S. market).

The Indictment also fails to adequately allege that Defendants "*meant* to produce"—i.e.,

intended to produce—a substantial U.S. domestic effect through their conduct.  *Hartford Fire*,

509 U.S. at 796 (emphasis added); *see also* H.R. Rep. 97-686, at 5 (1982) ("it would be a

miscarriage of Congressional intent to apply the Sherman Act to 'foreign activities which have

no . . . *intended* effect on United States consumers'" (emphasis added)).  In the personal

jurisdiction context, this District has declined to find intent to affect domestic commerce based

on conduct aimed at a different global financial metric.  *See, e.g.*, *7 W 57th St. Realty Co., LLC v.

Citigroup, Inc.*, No. 13-cv-981, 2015 WL 1514539, at *9, 11 (S.D.N.Y. Mar. 31, 2015) (no

personal jurisdiction in New York over foreign bank defendants where alleged manipulation of

U.S. dollar LIBOR benchmark "occur[red] entirely out-of-forum" and was not alleged to have

been done "with the express aim of causing an effect in New York"); *In re LIBOR-Based Fin.

Instruments Antitrust Litig.*, No. 11-MDL-2262, 2015 WL 6243526, at *20 (S.D.N.Y. Oct. 20,

2015) ("The false [U.S. dollar LIBOR] submissions . . . were not aimed at the United States or at

any forum state.").

The Indictment *asserts* the words "intended effect," but it then provides only an

inapposite example—that unidentified "U.S. counterparties" supposedly engaged in transactions

with Defendants.  Indict. ¶ 28.  As discussed above, the mere existence of a U.S. counterparty

does not transform a transaction in a London spot market into a domestic transaction.  And even

if it could, the Indictment does not allege Defendants ever *knowingly*, much less *intentionally*,

transacted with U.S. customers.  To the contrary, it alleges specifically that their transactions

were generally anonymous.  *Id.* ¶ 8 (on the "most widely used" exchange, the EBS platform,

"traders anonymously post prices and volumes at which they are willing to buy or sell").

Because the foreign conduct alleged in the Indictment had neither a substantial or intended effect in the United States, the Indictment must be dismissed under Supreme Court precedent, *Hartford Fire*, even if an FTAIA exception applies.

### D. THE SHERMAN ACT DOES NOT PERMIT CRIMINAL PROSECUTION OF WHOLLY FOREIGN CONDUCT

Even if the Indictment's allegations regarding Defendants' conduct could be read to meet FTAIA's requirements, this still should not permit a *criminal* prosecution of Defendants, because it is not settled that the Sherman Act's criminal provisions can reach wholly extraterritorial conduct.  Indeed, this would be the first case to do so.

The FTAIA does not expressly apply the Sherman Act's *criminal* provisions outside of the United States.  *See* 15 U.S.C. §§ 1, 6a.  "When the text of a criminal statute is silent, Congressional intent to apply the statute extraterritorially must 'be inferred from the nature of the offense.'" *United States v. Siddiqui*, 699 F.3d 690, 700-01 (2d Cir. 2012) (quoting *United States v. Bowman*, 260 U.S. 94, 98 (1922)); *see United States v. Sidorenko*, 102 F. Supp. 3d 1124, 1129-32 (N.D. Cal. 2015) (holding that bribery and wire fraud statutes did not apply extraterritorially).  In *Bowman*, the Court held that the presumption against extraterritorial application applies to criminal statutes that, like the Sherman Act, involve crimes against "the peace and good order of the community."  260 U.S. at 98.  *Bowman* removed from the presumption against extraterritoriality only those criminal statutes enacted "because of the right of the government to defend itself."  *Id.*; *see also Siddiqui*, 699 F.3d at 700 (no presumption against extraterritoriality for statutes prohibiting murder and assault of United States officers and employees).  The Sherman Act is not such a statute.

Accordingly, no court in the Second Circuit—or anywhere else—has extended the Sherman Act's criminal reach to wholly foreign conduct based solely on U.S. effects.  A twenty-year-old First Circuit decision, *United States v. Nippon Paper Industries Co.*, appears to be the only case that applied the Sherman Act to a foreign conspiracy with wholly foreign members

involving wholly foreign conduct.  109 F.3d 1 (1st Cir. 1997).[13]  But although the *Nippon Paper*

defendants acted from Japan, they—unlike Defendants here—specifically targeted the U.S.

market and made use of agreements with U.S. entities.  *See id.* at 2 (defendants agreed "to fix the

price of thermal fax paper throughout North America"; the conspiracy involved vertical

agreements with U.S. fax-paper importers to inflate "prices for the paper when they resold it in

North America").  Here, nothing in the Indictment points to any intent by London-based traders

transacting in London for London-based banks to target FX transactions inside the United States.

Thus, whether or not *Nippon Paper* was correctly decided,[14] that decision offers no basis to

extend the Sherman Act's criminal provisions to the conduct here.

Although the Supreme Court determined in *Empagran* that the FTAIA applies to conduct

involving wholly foreign commerce, that holding does not resolve the question here.  First,

unlike the charged conduct in this case, which took place entirely overseas in London, *Empagran*

involved anticompetitive conduct both in the United States as well as abroad and only addressed

whether the wholly foreign *part* of the alleged cartel was subject to the FTAIA.  *Empagran* 542

U.S. at 162.  It therefore did not actually address an entirely foreign *conspiracy*, like the one

alleged here.  *Id.* at 162.  Second, *Empagran* involved purely civil claims and the text of the

---

[13]    Just two criminal cases involving foreign conduct have been decided since *Nippon Paper*
(and none before it).  Both assume without analysis that the Sherman Act's extraterritorial
application extends to criminal matters.  And both are unlike the current case.  *United States v.
Anderson*, 326 F.3d 1319 (11th Cir. 2003), involved a conspiracy with a U.S. participant that
affected U.S. government contracts for work overseas.  *United States v. Hui Hsiung*, 778 F.3d
738 (9th Cir. 2015), involved a conspiracy that was partly foreign, but that also involved the U.S.
subsidiaries of the defendants, the importation of price-fixed products into the United States, and
U.S. domestic acts in furtherance of the conspiracy.

[14]    *Nippon Paper* was not correctly decided.  As an initial matter, the First Circuit incorrectly
disregarded the FTAIA.  *See* 109 F.3d at 3.  And, as then-attorney John G. Roberts, Jr. explained
in an amicus brief on behalf of the Japanese government, "A construction of the Sherman Act to
have extraterritorial reach in civil cases is . . . not [an] interpretive straitjacket . . . . [T]here is no
judicial precedent for applying the statute to criminalize conduct occurring wholly overseas. . . .
*Hartford Fire* . . . was not a criminal case, cited no criminal cases, and said nothing about
criminal cases.  Thus, it cannot control."  Br. of Amicus Curiae Gov't of Japan at *23-24, *United
States v. Nippon Paper Indus. Co.,* No. 96-2001, 1996 WL 33659179 (1st Cir. Nov. 21, 1996).

FTAIA itself refers only to "claims," which the antitrust laws use in civil proceedings, *see* 15 U.S.C. § 15 (Clayton Act), but not words like "violation," "felony," or "offense," which the antitrust laws use in the criminal context, *see* 15 U.S.C. §§ 1 (restraints on trade), 2 (monopolies).[15]

Finally, to the extent that the FTAIA's text is ambiguous as to whether the Sherman Act has any extraterritorial reach in criminal prosecutions, the rule of lenity requires "ambiguous criminal laws to be interpreted in favor of the defendants subjected to them." *United States v. Santos*, 553 U.S. 507, 514 (2008). This is especially important where foreign relations are at issue. Restatement (Third) of Foreign Relations Law § 403 cmt. F (Am. Law Inst. 1985) ("[I]n the case of regulatory statutes that may give rise to both civil and criminal liability, such as United States antitrust and securities laws, the presence of substantial foreign elements will ordinarily weigh against application of criminal law."). Thus, even if the conduct alleged in the Indictment was actionable under the Sherman Act's civil provisions, it does not support the unprecedented charges in this criminal case directed to wholly foreign conduct.

## VI.   THIS PROSECUTION VIOLATES DUE PROCESS

The Indictment also should be dismissed because this prosecution violates Defendants' due process rights. Even assuming the Sherman Act does reach the foreign conduct charged in the Indictment, the Due Process Clause of the Fifth Amendment requires that Defendants (1) have a "sufficient nexus" to the United States, and (2) receive "[f]air warning . . . that their conduct was criminal." *United States v. Al Kassar*, 660 F.3d 108, 118-19 (2d Cir. 2011). The Government's attempt to prosecute Defendants in the United States, to which their conduct allegedly had minimal if any connection, on a novel theory of criminal liability under the

---

[15] The word "claim" is also consistently defined, both in dictionaries and federal statutes, in language that connotes civil rights and remedies. And the word "claim" appears dozens of times in the Federal Rules of *Civil* Procedure, and not once in the criminal rules. *See* Simmons et al., *Where to Draw the Line: Should the FTAIA's Domestic Effects Test Apply in Criminal Prosecutions*, 29-SUM Antitrust 42 (2015).

Sherman Act, and based on alleged conduct that the United Kingdom's relevant enforcement authority investigated thoroughly and decided not to prosecute, fails both requirements.

## A.    DEFENDANTS' CONDUCT DID NOT HAVE A "SUFFICIENT NEXUS" TO THE UNITED STATES

When the Government seeks to prosecute a non-citizen for conduct occurring abroad, the Due Process Clause requires "a sufficient nexus between the defendant and the United States, so that such application [of the criminal law] would not be arbitrary or fundamentally unfair." *Al Kassar*, 660 F.3d at 118 (internal quotation marks and citation omitted).  A "sufficient nexus" exists only if "the *aim* of [the defendant's] activity is to cause harm inside the United States or to U.S. citizens or interests." *Id.* (emphasis added)*.*  In other words, the United States or its citizens must be the "specific[] target[]" of the foreign conduct. *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 341 (2d Cir. 2016) (no "aim . . . to harm U.S. citizens" where "the defendants undertook terror attacks within Israel" and lacking "evidence the attacks specifically targeted United States citizens"); *United States v. Mostafa*, 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013) ("the determinative issue is whether defendant's actions were calculated to harm American citizens and interests"); *Cf. Hartford Fire,* 509 U.S. at 796 & n.23 (foreign conduct only violates the Sherman Act where it has an intended substantial effect on the United States).

This prosecution targets conduct by three British traders acting entirely in the United Kingdom with no identified *harmful* effect in the United States.  As discussed above, the Indictment admits that the conduct may have neutral or beneficial effects on other counterparties (wherever they are located), and that the leading EUR/USD exchange matched transactions "anonymously," so Defendants would not have known with whom they were trading.  Indict. ¶ 8.  Even the EUR/USD "fixes" allegedly affected were concededly calculated in Europe, not the United States. *Id.* ¶ 10.  So even assuming there were any ripple effects in the United States due to Defendants' alleged conduct, the Indictment does not (and could not) allege such conduct was "calculated to harm" or "target" the United States or its citizens. *Mostafa*, 965 F. Supp. 2d at 459; *Waldman*, 835 F.3d at 341; *Al Kassar*, 660 F.3d at 118.  Because no sufficient nexus exists

between Defendants and the United States, the Indictment must be dismissed.  *See Al Kassar*, 660 F.3d at 118.

**B.**   **DEFENDANTS DID NOT RECEIVE "FAIR WARNING" THAT THE ALLEGED CONDUCT WAS CRIMINAL**

The Due Process Clause also requires that foreign defendants receive "fair warning" that their conduct could expose them to criminal liability.  *Al Kassar*, 660 F.3d at 119.  "The idea of fair warning is that 'no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'"  *Id.* (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 351 (1964)).  "Fair warning" exist only where the alleged acts are "self-evidently criminal."  *Id.*; *see also United States v. Epskamp*, 832 F.3d 154, 169 (2d Cir. 2016) (drug trafficking is "self-evidently criminal"); *United States v. Suarez*, No. 16-cr-453, 2017 WL 2417016, at *6 (S.D.N.Y. June 1, 2017) ("transporting mass quantities of cocaine over the high seas" is "self-evidently criminal"); *United States v. Ahmed*, No. 10-cr-131, 2011 WL 5041456, at *3 (S.D.N.Y. Oct. 21, 2011) (supporting a terrorist group is "self-evidently criminal"); *United States v. Naseer*, 38 F. Supp. 3d 269, 273 (E.D.N.Y. 2014) ("a defendant who allegedly plotted to bomb targets in the United Kingdom on behalf of al-Qaeda would reasonably have understood that his conduct was criminal").  In other words, the Due Process Clause forbids the prosecution of foreign defendants unless the alleged conduct is "condemned universally by law-abiding nations."  *United States v. Saac*, 632 F.3d 1203, 1210 (11th Cir. 2011) (drug trafficking is universally condemned); *United States v. Martinez–Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (same).

A far cry from murder, terrorism, and drug trafficking, the conduct alleged in the Indictment is premised on an unprecedented theory of criminal Sherman Act liability—one that involves actors in mixed horizontal-vertical relationships, who "purchased" *and* "sold" currency in a "continuous double auction."  Indict. ¶¶ 8, 24.  Moreover, prosecutors in the United Kingdom—the situs of the alleged crime—conducted an exhaustive investigation into the same conduct alleged here but declined to prosecute under laws that, like the Sherman Act, prohibit

unreasonable restraints of trade.[16]  The alleged conduct is thus surely not "self-evidently

criminal."  *Al Kassar*, 660 F.3d at 119.  To try Defendants in the United States for U.K. actions

in these circumstances would violate Defendants' Fifth Amendment rights and miscarry justice.

## VII.  THE COURT SHOULD ABSTAIN FROM EXERCISING JURISDICTION ON INTERNATIONAL COMITY GROUNDS

Even if the Court determines that the Indictment's allegations fit within the Sherman

Act's criminal proscriptions, the Court should abstain from exercising its jurisdiction on the

grounds of international comity.  International comity "is the recognition which one nation

allows within its territory to the legislative, executive or judicial acts of another nation."  *Hilton*

*v. Guyot*, 159 U.S. 113, 164 (1895).  Even where a statute confers subject matter jurisdiction,

"Congress left it to the courts to decide when to employ notions of abstention from exercising

jurisdiction in extraterritorial antitrust cases."  *O.N.E. Shipping Ltd. v. Flota Mercante*

*Grancolombiana, S.A.*, 830 F.2d 449, 452 (2d Cir. 1987).  The FTAIA's legislative history

confirms that Congress never intended to strip courts of their discretionary power to decline

jurisdiction over foreign conduct on comity grounds.  *See* H.R. Rep. No. 97-686, at 13 (1982)

("If a court determines that the requirements for subject matter jurisdiction are met, [the FTAIA]

would have no effect on the court['s] ability to employ notions of comity . . . .").

Here, the relevant factors that guide courts in determining whether to abstain from

asserting jurisdiction on international comity grounds militate against the Court's exercise of

criminal jurisdiction over foreign defendants who engaged in entirely foreign conduct.  *See In re*

*Vitamin C Antitrust Litig.*, 837 F.3d 175, 184-86 (2d Cir. 2016).[17]  All three defendants in this

---

[16]  *See infra* section VII.

[17]  The international comity factors are:  "(1) Degree of conflict with foreign law or policy;
(2) Nationality of the parties, locations or principal places of business of corporations; (3)
Relative importance of the alleged violation of conduct here as compared with conduct abroad;
(4) The extent to which enforcement by either state can be expected to achieve compliance, the
availability of a remedy abroad and the pendency of litigation there; (5) Existence of intent to
harm or affect American commerce and its foreseeability; (6) Possible effect upon foreign
relations if the court exercises jurisdiction and grants relief; (7) If relief is granted, whether a
party will be placed in the position of being forced to perform an act illegal in either country or

case are citizens and residents of the United Kingdom (factor 2).  The alleged conduct took place

entirely in the United Kingdom, on a British trading platform, in a decentralized, global market,

and the Indictment does not describe any specific effect in the United States (factor 3).  The

Indictment does not allege intent to target the United States, and in fact suggests the contrary

(factor 5).

Finally, the United Kingdom has a robust enforcement regime for antitrust matters.  The

UK SFO, which is responsible for investigating and prosecuting complex economic crimes such

as antitrust violations, conducted an exhaustive, 18-month investigation of the conduct described

in the Indictment.  In declining to prosecute any of Defendants for cartel or fraud offenses, the

SFO wrote:

> The SFO has concluded . . . *that the alleged conduct, even if proven and taken at its highest, would not meet the evidential test required to mount a prosecution* for an offence contrary to English law.  It has further been concluded that *this evidential position could not be remedied by continuing the investigation*.

Tewksbury Decl. ¶ 9 & Ex. H (Mar. 15, 2016 letter from SFO) (emphasis added).[18]  The United

Kingdom—the very jurisdiction in which the conspiracy allegedly occurred—thus determined

that the charges here are *not* a basis for criminal antitrust charges (factor 4).

Thus, even if the Court finds that the Sherman Act's criminal provisions apply

extraterritorially, and that the Indictment alleges conduct within these provisions' scope, the

Court should abstain from exercising jurisdiction.

---

be under conflicting requirements by both countries; (8) Whether the court can make its order effective; (9) Whether an order for relief would be acceptable in this country if made by the foreign nation under similar circumstances; and (10) Whether a treaty with the affected nations has addressed the issue."  *Vitamin C*, 837 F.3d at 184-85.

[18]     Defendants request that the Court take judicial notice of the fact that the SFO declined to prosecute Defendants under Federal Rule of Evidence 201.  *Supra* note 1; *Sullivan v. Barclays PLC*, No. 13-cv-2811, 2017 WL 685570, at *20-21 (S.D.N.Y. Feb. 21, 2017) (taking judicial notice of fines by the European Commission and deferred-prosecution agreements); *In re Deutsche Bank Aktiengesellschaft Sec. Litig.*, No. 16-cv-3495, 2017 WL 4049253, at *5 (S.D.N.Y. June 28, 2017) (taking judicial notice of consent order).

## VIII. CONCLUSION

For the foregoing reasons, the Court should grant Defendants' Motion and dismiss the Indictment or certain allegations therein.

Dated: November 17, 2017
      San Francisco, California

                                        Respectfully submitted,

                                        By: /s/ *Heather S. Tewksbury*

Heather S. Tewksbury (*pro hac vice*)
WILMER CUTLER PICKERING
HALE AND DORR LLP
950 Page Mill Road
Palo Alto, California 94304
Tel:  (650) 858-6000
Fax:  (650) 858-6100
Email: heather.tewksbury@wilmerhale.com

Anjan Sahni
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel:  (212) 230-8800
Fax: (212) 230-8888
Email: anjan.sahni@wilmetrrhale.com

*Attorneys for Defendant Rohan Ramchandani*

J. Mark Gidley (*pro hac vice*)
WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
Telephone:  (202) 626-3609
mark.gidley@whitecase.com

Michael Kendall (*pro hac vice*)
WHITE & CASE LLP
75 State Street
Boston, MA 02109
Telephone:  (617) 979-9310
michael.kendall@whitecase.com

Andrew E. Tomback
WHITE & CASE LLP
1221 Avenue of the Americas
New York, NY 10020
Telephone:  (212) 819-8428
andrew.tomback@whitecase.com

*Attorneys for Defendant Richard Usher*

David Schertler (*pro hac vice*)
SCHERTLER & ONORATO, LLP
1101 Pennsylvania Avenue, N.W.
Suite 1150
Washington, D.C.  20004
Office:  (202) 628-4155
Cell:    (202) 905-4118
Email:   dschertler@schertlerlaw.com

*Attorney for Defendant Christopher Ashton*